```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON


_____x
                              :
UNITED STATES OF AMERICA,      :        Criminal Action
                              :
              Plaintiff,      :        No.  2:14-cr-00264
                              :
v.                            :
                              :        Date:  January 5, 2015
DENNIS P. FARRELL &           :
GARY L. SOUTHERN,             :
                              :
              Defendants.     :
_____x


            PARTIAL TRANSCRIPT OF MOTIONS HEARING HELD
         BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
                 UNITED STATES DISTRICT COURT
                 IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:      AUSA PHILIP H. WRIGHT
                         AUSA LARRY R. ELLIS
                         AUSA ERIC P. BACAJ
                         U.S. Attorney's Office
                         P.O. Box 1713
                         Charleston, WV  25326-1713


For the Defendants:      MICHAEL W. CAREY, ESQ.
                         S. BENJAMIN BRYANT, ESQ.
                         Carey Scott Douglas & Kessler
                         P. O. Box 913
                         Charleston, WV 25323


                         ROBERT B. ALLEN, ESQ.
                         PAMELA C. DEEM, ESQ.
                         SAMUEL D. MARSH, ESQ.
                         Kay Casto & Chaney
                         P. O. Box 2031
                         Charleston, WV 25327-2031
```

APPEARANCES CONTINUED:

                              MARK C. MOORE, ESQ.
                              Nexsen Pruet
                              7th Floor
                              1230 Main Street
                              Columbia, SC 29201

                              WILLIAM W. WILKINS, ESQ.
                              Nexsen Pruet
                              Suite 400
                              55 East Camperdown Way
                              Greenville, SC  29601


Court Reporter:               Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1          PARTIAL PROCEEDINGS had before The Honorable Thomas E.

2     Johnston, Judge, United States District Court, Southern District

3     of West Virginia, in Charleston, West Virginia, on January 5,

4     2014, as follows:

5          (Prior proceeding preceded the following; filed under

6     separate cover).

7              THE COURT:  So let's go back to my original question,

8     which is, we're going to, I presume, be able to proceed by

9     proffer today.  What kind of information do we need to get into

10    the record by way of proffer?

11       Mr. Allen?

12             MR. ALLEN:  Can I have just one second, Your Honor?

13             THE COURT:  You may.

14       (Pause).

15             MR. WILKINS:  Your Honor, I don't think there's a

16    dispute that there were over 300,000 people in the nine-county

17    area in West Virginia affected by this chemical spill and that we

18    suggest, although we haven't taken depositions, that the United

19    States Attorney and his family, his staff members and their

20    families, were all affected, just as the other 300,000-plus

21    citizens of West Virginians were affected.  I think --

22             THE COURT:  I'm sorry, Judge Wilkins.  Let me ask you

23    this question.  This is the other thing I wanted to talk with you

24    about a little bit before we proceeded.  Many of these same

25    arguments would apply to me.

```
1               MR. WILKINS:  Yes, they would.

2               THE COURT:  And --

3               MR. WILKINS:  But we'd waive --

4               THE COURT:  You haven't moved to disqualify me yet.

5               MR. WILKINS:  We waive any conflict regarding Your

6    Honor.

7               THE COURT:  Well, just to make the record complete on

8    that -- I appreciate that.  To make the record complete on that,

9    I live in a place that was unaffected -- the water was unaffected

10   by this episode and, although I work in this courtroom and water

11   in the courthouse was obviously affected, we -- my staff and I

12   will kick in and use bottled water, or the cooler, the big

13   five-gallon jugs of water.  We probably bought a little extra

14   water during that period of time, but other than that, other than

15   the general way in which the building was affected, I wasn't

16   personally affected.

17        My children were off school for awhile, but they seemed to

18   like that.  So, other than that, I -- there was no personal

19   effect on me.  So, and I think that, unless you're speaking in

20   broader terms, there were at least -- I know several of the

21   members of the U. S. Attorney's Office, including the U. S.

22   Attorney and some of his leadership, and I have a general idea of

23   where they live, and I also know that at least some of them

24   probably were similarly situated to me, in that they did not

25   personally in their homes lose the use of their water.  I add all
```

1    that for -- I understand your waiver, but I want to make all of

2    that clear on the record.

3          MR. WILKINS:  Well, thank you, Your Honor.  What we say

4    in our motion is that everyone in the U. S. Attorney's Office was

5    affected by this crisis and we think that to be a true statement.

6    It has not -- it has not been denied.  So we offer that as a

7    proffer, as well.  We can get beyond the fact that, well, maybe

8    there was one or two here that weren't affected or not, I don't

9    know that, but a great majority of all the members of the U. S.

10   Attorney's Office, we believe, and their families were affected,

11   like the other 300,000-plus people were.

12         THE COURT:  All right.  Well, let's continue down the

13   proffer road then.  Are there any other facts that the defense

14   wishes to proffer for my consideration of this motion?

15         MR. WILKINS:  I don't think so, Your Honor.

16         THE COURT:  Mr. Carey?

17         MR. CAREY:  Your Honor, just by way of supplementing

18   what Mr. Wilkins has said, and that is, it is our position that

19   anyone who either worked in the office at a time in which it was

20   affected by the water crisis, or lived in the area at the time

21   the -- and their families lived in the area, or they had

22   relatives in the area that were affected by it, constitute

23   victims in this case.

24     I, too, have discussed this issue of waiver in relation to

25   the Court and my client consents to a waiver of any conflict of

1    the Court hearing this matter and proceeding in this case.

2    However, we don't believe that the U. S. Attorney's Office should

3    continue in this case because of the conflict.

4        And so, unless there's some dispute that this office was

5    disrupted and; that is, the Charleston Office, and the members of

6    their staff who live in this area were also disrupted, then I

7    believe that's sufficient.

8            THE COURT:  I would add to the comments about the

9    Court, that I have examined the consolidated amended complaint in

10   the cases pending before Judge Copenhaver and the class that has

11   been proposed in that amended complaint excludes the Court and

12   its personnel.  So that's already in the Court's record in the

13   other case.

14       Mr. Wright, do you or the government have any facts that you

15   wish to proffer?  I'm going to have some questions along the

16   lines of a proffer here in a moment, but I wanted to see if you

17   all have anything you want to proffer.

18           MR. WRIGHT:  I don't have anything I want to proffer,

19   Your Honor, but I don't want it to be viewed that the United

20   States agrees with their version of the facts in terms of what's,

21   in effect, just as affected as 300,000 people.  We dispute that.

22   "Disrupted"?  What does that mean?  All of those things, Your

23   Honor, we don't agree with, at least to the extent that they're

24   trying to argue that we should not be the prosecutors in this

25   case.

1        Now, Your Honor mentioned some level of effect to the Court.

2   Our position is, we were no more affected by this than you were,

3   but I would also point out, Your Honor, even if they waived --

4              THE COURT:  Well, that depends, doesn't it?  That

5   depends.  I mean, I've been looking at the law on this, or the

6   lack thereof, and I'm trying to sort through what's important and

7   what's not, but there's -- you lost your water at your home,

8   didn't you?

9              MR. WRIGHT:  Yes, Your Honor.

10             THE COURT:  I didn't.  That may or may not be an

11  important distinction, but -- and, under the law right now, I'm

12  not sure if it is or not, but it's the kind of thing I'm trying

13  to flush out here.  There's no question then that you were more

14  impacted by this than I was.

15             MR. WRIGHT:  Well, Your Honor, what I was referring to

16  is the specific sentence in, I think it's the reply memorandum of

17  Mr. Farrell, that because this building was closed, that alone

18  makes us a victim and, in that sense, we're no more a victim than

19  you were.

20      Your Honor, I also point this out.  If the entire U. S.

21  Attorney's Office is recused, the entire office, because the

22  entire office is victim, is a victim, then that would include

23  your wife.

24      And I don't know that a defendant can waive a conflict of

25  interest by a judge.  We don't believe that there is one.  Not

1    for a second do we agree that there is one.  We don't even think

2    that they can waive that.

3           THE COURT:  Well, that gets back to my threshold

4    comments about the Court.  As probably most of you are aware, my

5    wife is an Assistant U. S. Attorney in this office, so that --

6    does that change -- I know Mr. Carey and Mr. Allen both are aware

7    of that.  Does that change the analysis with regard to the Court?

8           MR. CAREY:  It does not, Your Honor, and that is an

9    issue I specifically addressed with my client and he still wishes

10    to waive it.

11           MR. ALLEN:  Likewise, Your Honor, we do not see that as

12    a problem whatsoever.  I understand she's in the Huntington

13    office anyway, I think, isn't she?

14           THE COURT:  No.  She's --

15           MR. ALLEN:  She's back here now?

16           THE COURT:  She's been back in Charleston for a little

17    while.

18           MR. ALLEN:  Okay.

19           THE COURT:  Well, aside from being in the office, she's

20    obviously situated in the same way that I am, in terms of the

21    information I gave earlier.

22       Well, obviously, the main office of the U. S. Attorney's

23    Office in this district is here in this building.  This building

24    -- the water in this building was affected, as well as many other

25    homes and businesses in the area.  I mean, that is what it is.  I

1    was here for it.  I know what happened.

2        Let me -- let me move on.  I think the way that individuals

3    were personally affected may make a difference in this, among

4    other things, because of the phrasing of the amended complaint in

5    the class action.  So I think it's important to establish, at

6    least for some of the individuals in the U. S. Attorney's Office,

7    whether or not the water in their homes was actually affected.

8        Mr. Wright, we have already established that yours was.

9        Mr. Ellis, I believe in the area where you live, it was

10   probably not affected; is that correct?

11              MR. ELLIS:  It was not, Your Honor.

12              THE COURT:  Okay.  Mr.Bacaj, were you even here then?

13              MR. BACAJ:  No, I was not, Your Honor.

14              THE COURT:  Okay, fair enough.  Now, I understand, and

15   this is just based on my personal knowledge, Mr. Wright, that

16   both the U. S. Attorney and its First Assistant were probably

17   affected.  Their waters at their homes were probably both

18   affected; is that correct?

19              MR. WRIGHT:  I believe that's correct, Your Honor.

20              THE COURT:  Okay.  Now, under those -- can we agree

21   that for people who -- whose homes were affected, they needed to

22   -- and this is -- this was your personal experience.  Mr. Wright,

23   you may have handled it differently than somebody else, but

24   anybody who was affected had to get water somewhere, and had to

25   bathe somewhere, and had to wash their clothes somewhere, and had

1    to procure water for drinking and for food somewhere, correct?

2    MR. WRIGHT:  Yes, Your Honor, but that doesn't

3    necessarily mean that we couldn't do certain things and had to

4    leave our house just to take a shower.

5    THE COURT:  Well, that's not my point.  My point is,

6    and this is -- I've looked at the -- I've looked at the -- I

7    guess, the extended clause in the consolidated amended complaint

8    in the cases pending before Judge Copenhaver.  One of the clauses

9    in the damage part of the complaint seeks an award of damages or

10   mechanism for recovery for class members who incurred costs for

11   water replacement, travel, water heater appliance, or plumbing

12   repair or replacement, and any other out-of-pocket expenses as a

13   result of the defendant's conduct, acts or omissions.  It seems

14   to me that, in terms of at least water replacement, anybody who

15   was affected by this had to find water somewhere else, did they

16   not?

17   MR. WRIGHT:  Yes, Your Honor, but that doesn't

18   necessarily mean we incurred costs.

19   THE COURT:  Well, I guess I suppose that's true,

20   because there were some who -- there were some neighborly folks

21   who gave water to their friends and family, and then there were

22   certain -- there were certain charitable organizations, as well

23   maybe the state government, who procured water to give to

24   residents for free.  However, I'm sure there were others who

25   incurred some expenses in that.

```
 1          I guess my point is that the consolidated complaint is very
 2     broadly worded in terms of potential damages and those who could
 3     potentially be class members and that's the reason I'm asking
 4     these questions about individual members of the U. S. Attorney's
 5     Office and how they may have been impacted by it.
 6          Does anybody want to add anything in terms of a proffer of
 7     facts based on the discussion we have had?
 8               MR. ALLEN:  I would just add that Mr. Tony Majestro, in
 9     the state actions that were removed and are pending before Judge
10     Copenhaver, and then there's a request for remand pending, also,
11     but he filed a proof of claim on behalf of certain individuals,
12     as well as certain businesses, and all of those similarly
13     situated.  So there was some representation by the U. S.
14     Attorney's Office that, you know, there's no bankruptcy issues
15     because nobody filed a proof of claim.  Tony Majestro filed one
16     on behalf of all of those people.  I would make that proffer.
17               THE COURT:  All right.
18               MR. ALLEN:  It would include everybody in the U. S.
19     Attorney's Office.
20               MR. WRIGHT:  Your Honor, the only thing I would add is
21     that the prayer for relief also includes other factors, which I
22     believe members of the U. S. Attorney's Office and his staff were
23     also exposed to in potential claims before, and that is a prayer
24     for relief, Subparagraph 9, an award for damages and mechanism
25     for recovery to compensate for loss and use of enjoyment of
```

1    property, annoyance, nuisance, aggravation and inconvenience, and

2    under 10, an award of punitive damages for all of those who were

3    exposed to crude MCHM; in other words, if any of the members of

4    the U. S. Attorney's Office drank the water before the Do Not Use

5    went out, but before the time in which they were exposed to it,

6    they might have a claim and, also, an order establishing a

7    medical monitoring program, any of the people, particularly if

8    children were involved, would certainly be interested in pursuing

9    participation in a medical monitoring process relating to any

10   exposure of MCHM.  So there are ways in which members of the U.

11   S. Attorney's Office were exposed and suffered harm and potential

12   claims, just like the general public did, beyond just buying

13   bottled water and traveling elsewhere to wash clothes or get

14   showers.

15          THE COURT:  Well, my goal was to get proffers in the

16   record first and then hear argument.  We've kind of drifted into

17   argument here, but does anybody else have anything to proffer in

18   terms of facts?

19          MR. WRIGHT:  Nothing to proffer, Your Honor, but I

20   would make this note about any facts.  If it's going to come down

21   to facts, it would require a mini trial with every AUSA and the

22   U. S. Attorney in the office about how much did you spend?  How

23   much was your water bill lowered by the fact that you weren't

24   using the water?  How much gas did you spend?  How could you

25   actually compute what you would have spent on gas if you had done

1    something else other than go to a water distribution site to get

2    free water?  All of those things are going to be extremely

3    complicated.

4        Our point is that none of that rises legally to the point

5    where this Court can, under the due process clause, recuse this

6    office and that would be our legal argument that I'm prepared to

7    get into when we get to that.

8            THE COURT:  Yes.  Let's get into the legal arguments

9    now, because I have some questions about this, but I think it's

10   better, at this point, to leave the legal argument and, Mr.

11   Allen, or whoever wants to go first on the defense side, it's

12   your all's motion.

13           MR. ALLEN:  Mr. Wilkins would like to present our

14   motion before the Court.

15           THE COURT:  All right.  Fair enough.

16           MR. WILKINS:  May I approach the podium?

17           THE COURT:  You may.

18           MR. WILKINS:  May it please the Court.  On December the

19   17th, the U. S. Attorney held a press conference and he made the

20   statement, "It's hard to overstate" --

21           MR. WRIGHT:  Your Honor, I apologize for this, but I'm

22   not sure that mic is on and I'm having difficulty hearing Mr.

23   Wilkins.

24           THE COURT:  Yes.  It doesn't seem like it is on.

25           MR. WRIGHT:  If I may step up, Your Honor, I think --

1           MR. WILKINS:  The button may be --

2           THE COURT:  There we go.

3           MR. WILKINS:  On December the 17th, the United States

4    Attorney issued this press release, a press release, and he

5    stated, "It's hard to overstate the disruption that results when

6    300,000 people suddenly lose clean water."

7        In the amended motion to recuse and disqualify, Mr. Allen

8    wrote in part, and perhaps, now we need to say almost every

9    person in the United States Office was an actual victim.  "Every

10   person," he writes, "in the United States Office suffered the

11   same hardships as -- generally speaking, as 300,000-plus victims.

12   Everyone in the U. S. Attorney's Office was affected at work and

13   many of them, including their families, were affected at home.

14   Every employee of the United States Attorney's Office was in the

15   same position as everyone else mired in this crisis and their

16   families were also actual victims."

17       Now, in response to this, in their papers they filed, the U.

18   S. Attorney says, well, we weren't really actual victims because,

19   "because" is important, because when a violation of the Clean

20   Water Act occurs, the general public are the real victims.  Well,

21   I guess, as a general statement, that may be true but, in fact,

22   along with many others, the U. S. Attorney's staff suffered

23   specific harms, including, including, as was just pointed out,

24   the sort of aggravation and inconvenience, which I must suggest,

25   Your Honor, will apply just about across the board to anyone

1    affected by the water crisis.

2        And I know that the Court well knows that the presence of an

3    interested prosecutor is a fundamental error that undermines

4    confidence of the integrity of our criminal proceedings.  Because

5    of the fundamental nature of this error, because of the

6    fundamental nature, Courts do not even engage in harmless error

7    or prejudicial analysis.  The government responds by saying

8    recusal would create a dangerous precedent.  It then rings a

9    false alarm bell by saying the U. S. Attorney in Boston would be

10    prohibited from prosecuting the Marathon Bomber.  We're not

11    saying that at all.

12        What we are saying is the U. S. Attorney, or his family, or

13    members of his staff, have been injured by that explosion.  The

14    U. S. Attorney has a lot of responsibility to seek forth a

15    recusal and failing so, a Court should step in and order it done

16    for the simple reason recognized time and time again.  This is to

17    prevent the appearance of a conflict or to prevent the loss, the

18    appearance of the loss, of impartiality.

19        On Page 9 of its response, the government quotes from our

20    motion where Mr. Allen states that, "Members of the United States

21    Attorney's Office and their families," and I quote, "are among

22    the residents who were affected by the water crisis and thus are

23    included in a potential class of plaintiffs in various civil

24    actions that have been filed."

25        Now, rather than acknowledge the obvious, and that is, well,

1    yes, that is a real possibility, the U. S. Attorneys resist by

2    saying, well, we can't control what private attorneys do bringing

3    private lawsuits.  No class has yet been certified, and it will

4    be years before these class actions have been concluded, class

5    actions, again, based in part on the aggravation and

6    inconvenience, a cause of action, if you study the papers

7    submitted by the government, a cause of action that it fails to

8    recognize and address.

9        Now, in the first motion to recuse or disqualify, Mr. Allen

10   filed it two days after the -- before the indictment was handed

11   down, but after the criminal complaint had been filed.  In that

12   motion, Mr. Allen states that Mr. Southern has been singled out

13   and charged with wire fraud based on an ECF filing.

14       Mr. Allen goes on to state, "The government was fully aware

15   that he, acting as Mr. Southern's attorney, made that ECF filing

16   and that the government has attempted to deprive Mr. Southern of

17   his Sixth Amendment right to counsel of his choice."  In its

18   complaint, the government used the words "wire fraud", and so Mr.

19   Allen used the same words in filing that first motion.

20       First of all, Your Honor, it is incredible that the

21   government will seek an indictment based on electronic court

22   filings by someone's attorney.  Equally incredible is the

23   government's response to this.

24       The government claims Mr. Allen, and quote from their

25   papers, "misstates the facts".  So, how did he misstate the

1    facts?  The government says he misstated the facts because he

2    used the words "wire fraud" and not "bankruptcy fraud", as if

3    that makes a difference.

4        What does make a difference, is that while the government

5    was splitting hairs about things like "wire fraud" and

6    "bankruptcy fraud", the government does not deny anywhere that it

7    was attempting to deny Mr. Southern of his Sixth Amendment right

8    to counsel of his choice, and that is because now, as the case

9    goes forward, Mr. Allen will be compelled to be a witness.

10   That's primarily the reason I'm here today.

11       Finally, Your Honor, while I think it is abundantly clear

12   that a conflict exists or, at the very least, the appearance of a

13   conflict exists and, if that is the case, the Court now has

14   addressed the issue of whether the U. S. Attorney has

15   demonstrated a loss of impartiality, which would also require

16   disqualification of his office.

17       Nevertheless, in closing, I'd just like to make two very

18   brief comments about that.  In its response on Page 17, the

19   government emphasizes, and I quote, "The United States Attorney

20   did not opine on Southern's guilt and that he has complied with

21   the Rules of Professional Conduct and DOJ policy governing extra

22   judicial statements."

23       But did they follow these rules of policies when, in a press

24   release, he said, "We need to make it crystal clear that those

25   who engage in this kind of criminal behavior that led to this

1     crisis must be held accountable."  What is crystal clear is that

2     during the press conference when this statement was made, he was

3     referring to Mr. Southern and the three other co-defendants who

4     were named in the indictment that had just been filed within a

5     few hours.  The purpose for which the press conference had been

6     called was to publicly announce this indictment of Mr. Southern

7     and three others.  It was crystal clear that the United States

8     Attorney was publicly claiming that Mr. Southern was guilty of

9     criminal conduct.

10          And, finally, the government goes on.  On Page 22 of its

11    response, a public document, talking about Mr. Southern,

12    references not made to alleged misconduct, but rather, the

13    government boldly asserts, and I quote, "The U. S. Attorney's

14    Office has the most extensive knowledge of the evidence of his,

15    Mr. Southern's, crime.  It has the most extensive knowledge of

16    his crimes."  All of this is has clearly crossed the line and, if

17    it has not crossed the line, Your Honor, there is not one.  Thank

18    you.

19              THE COURT:  Thank you, sir.

20          Mr. Carey?

21              MR. CAREY:  May it please the Court, counsel, I'll do

22    my best not to replicate the arguments of Mr. Wilkins, but what I

23    would like to do at first is discuss what I believe is the policy

24    and the basis for the line of cases that deal with the issue of

25    whether a prosecutor should be recused in a certain case.

1        The best discussion I've seen is the U. S. Supreme Court
2    case in *Young* in which Louis Vuitton lawyers were appointed by
3    the District Court to prosecute a contaminate that he believed
4    occurred in relation to one of his orders, and the Supreme Court
5    reversed that appointment of the Louis Vuitton lawyers and did so
6    based on a very thorough analysis of the role of a prosecutor.
7    They first looked to the *Burger* case and said that an obligation
8    of a prosecutor is unique.  It's not to win the case, but to see
9    that justice is done and, because of that unique responsibility,
10   federal prosecutors are prohibited from representing the
11   government in any matter in which they, their family, or business
12   associates have an interest.
13       And then the Court goes on to enumerate a myriad of
14   responsibilities that involve the discretion and judgment of the
15   U. S. Attorney that is unseen and unsupervised by the courts.
16   The prosecutor determines who will be the targets.  The
17   prosecutor determines who will get immunity, who to charge, what
18   pleas will be offered, and what charges to actually bring.
19       And, because of that, the Court said, relying on *Marshall v.*
20   *Jerrico*, that a disinterested prosecutor is required because a
21   scheme injecting a personal interest, financial or otherwise, and
22   so it doesn't have to just be financial, into the enforcement of
23   process may bring irrelevant or impermissible factors into the
24   prosecutorial decision making process.
25       Now, in that case, that is the *Young* case, the Court, the U.

1    S. Supreme Court found that the Louis Vuitton lawyers had a

2    conflict because they worked for a company who would benefit from

3    the enforcement of a contempt action.  The Court then looked at

4    whether, in fact, once a conflict is determined, do we have to

5    conduct a harmless error review, and the Supreme Court said that

6    we have previously held that some errors are so fundamental and

7    pervasive that they require reversal without regard to the

8    particular circumstances of the conflict and whether it actually

9    resulted in any harm.  They said an error is fundamental if it

10   undermines the confidence and the integrity of a criminal

11   proceeding, and the Court stated affirmatively that the

12   appointment of an interested prosecutor raises such doubt.

13    And they use terms like "interested prosecutor".  They don't

14   say "those limited to a financial claim".  They say "interested

15   prosecutors" and, thus, they say, "Prosecution by someone with

16   conflicting loyalties calls into question the objectivity of

17   those charged with bringing a defendant to judgment."

18    The Court further stated, "It is a fundamental premise of our

19   society that the State wields its former criminal enforcement

20   powers in a rigorously disinterested fashion, for liberty itself

21   may be at stake in such matters," as it is here.

22    Furthermore, they state, "The appointment of an interested

23   prosecutor creates an appearance of impropriety that diminishes

24   faith in the fairness of the criminal justice system."

25    Now, in this case, in the government's brief, they do

1    recognize, at least this portion of the *Young* holding that was

2    followed in *Sigillito*, they state,"In the absence of an actual

3    conflict of interest, no prosecutor or staff employee should be

4    disqualified from this case," and cited *Sigillito*.  They don't

5    address whether the appearance of conflict is sufficient in this

6    case, but they do agree that if there is an actual conflict, then

7    they should be disqualified.

8        Now, the government contends they are not victims because

9    they say that the Clean Water Act is a public welfare statute and

10   that the, quote, "victim", is the public.  Well, they cite the

11   *Hanousek* -- if I'm pronouncing it right -- case for that

12   proposition, and that's not what the case says.

13       The case says that a public welfare -- public welfare

14   legislation is designed to protect the public from harmful or

15   injurious items, but in this case, those persons harmed or

16   injured are 300,000 specifically delineated people, including the

17   Prosecutor's Office, and why we know that, all we have to do is

18   look to the indictment itself.

19       In Paragraphs 10-13, it states that, "MCHM leaked from the

20   facility, migrated to the Elk River, passed through the West

21   Virginia American Water purification system," resulting in a,

22   quote, "Do Not Use directive that denied clean water for

23   drinking, cooking and washing for 300,000 people in a nine-county

24   area for several days."

25       The U. S. Attorney, at his press conference said, "Freedom

1    Industry's flagrant disregard of the law allowed the tank to fall

2    into disrepair, causing a spill which affected 300,000 people."

3    He didn't say "the public".  He said the "300,000 people," the

4    300,000 people that are specifically referenced in the

5    indictment.

6         And, as Judge -- as Mr. Wilkins has said, the U. S. Attorney

7    in his press release said, "It's hard to overstate the disruption

8    that results when 300,000 people suddenly lose clean water."

9    They want their cake and eat it, too.  This caused a disruption

10   that you cannot overstate, but now they want to say, well, those

11   of us in the office and those of us who lived were minimally

12   disturbed.  If can't state the disruption, it applies across the

13   board, Your Honor.

14        And, notwithstanding this allegation, they continue to argue

15   they are not victims.  The Crime Victim and Witness Protection

16   Act defines a crime victim as "a person who is directly and

17   proximately harmed as a result of a commission of a federal

18   offense," and that's exactly what you have here, 300,000 people

19   who they allege were harmed as a result of this criminal offense.

20        And Congress created substantial rights for the victims

21   because they have significant interest in the outcome of the

22   case.  They get notice of all significant proceedings.  They are

23   notified of trial dates.  They are given an opportunity, upon

24   conviction, to speak at the time of sentencing under the control

25   of the Court, and so the victim is an interested party throughout

1    the process and they are victims in this case.  Each and every

2    person who worked in this office or lived in the residential area

3    affected are victims in this case.

4        Ostensively, they could not drink the water.  They could not

5    cook.  They could not bathe.  They smelled the bad odor.  Again,

6    the U. S. Attorney himself said you cannot overstate the

7    disruption.

8        Also, they are class -- punitive class members to a

9    multitude of class actions, one of which is the *Good* (phonetic)

10   case, which the Court has already referenced, that identifies

11   four claims.  Physical personal injury torts, and we don't know

12   whether any of the members of the U. S. Attorney's Office have

13   claimed physical injury; a non-physical tort claim; property

14   damage; and financial.

15       Did they have to buy water?  Did they have to travel out of

16   town to bathe?  Interestingly enough, they make the assertion

17   that none of the members of the staff suffered any injuries

18   identified in Categories 1, 3 or 4, but they make no reference to

19   item number 2, which is non-physical tort claims, like

20   aggravation and inconvenience and, if you look in the *Good* case,

21   in the addendum clause, and the prayer for relief, and it's also

22   in the body, they claim that all of the -- the complaint asserts

23   that all 300,000 people are similarly situated because they all

24   suffered the same aggravation and inconvenience and they're

25   asking for damages to pay for the aggravation and inconvenience.

1           THE COURT:  Let's just be clear about one point.  I

2    remember from my civil practice that aggravation and

3    inconvenience are items of damages.  They're not causes of

4    action.

5           MR. CAREY:  That's correct.  That's correct.  And they

6    are items of damages because, in this case, they've alleged a

7    negligent discharge of a pollutant into a water stream that went

8    into the use of our homes, resulting in a Do Not Use directive

9    preventing them from using the water.  One of the damages

10   resulting from that negligent discharge is aggravation and

11   inconvenience.  So it is a claimed element of damages.

12        Now, are they going to say that no one bought water from the

13   stores?  No one traveled?  Are they going to refuse to

14   participate in a class action settlement for their staff for a

15   portion of the damages or aggravation and convenience?  Are they

16   going to say that no members of their staff are going to

17   participate in medical monitoring that could go years into the

18   future and which would be substantial -- or that would be very

19   expensive?

20        Regardless of those financial issues, they, too, are simply

21   victims of this thing and, thus, they have a different

22   perspective than an unbiased neutral prosecutor.  As a victim,

23   they have a special interest in the outcome of the case, which at

24   anytime, could affect their decision making and, as *Young* said,

25   once a conflict is determined to exist, the Court does not weigh

1    the gravity of the conflict.  The existence of the conflict

2    requires recusal.

3         And, finally, recusal is also required because of the

4    appearance of the conflict.  In this case, the public has

5    recognized that the U. S. Attorney's Office is in no different

6    position than the 300,000 who were affected.

7         In the interview the U. S. Attorney participated in with

8    Hoppy Kercheval, Mr. Kercheval said, "This was a huge deal.  You

9    lived there.  You're among those who couldn't use the water.  A

10   lot of West Virginians could not use the water.  This is a big

11   deal.  This is a big deal.  And so this is the latest step on

12   that.  That's not much of a question.  That's just a comment," to

13   which the U. S. Attorney responded, "Sure."  He did not deny that

14   he was part of the people who lived there, who couldn't use the

15   water, and that it was a big deal.  As such, the U. S. Attorney

16   and his staff have a personal interest in the outcome of this

17   case and I believe the law requires the recusal of the office.

18             THE COURT:  All right.  Thank you, Mr. Carey.

19        And, by the way, before we move on to the government, I want

20   to clear up something that was raised originally, and I think

21   only in Mr. Southern's motion, and that is, in the original

22   motion, there was discussion of disqualification, if that's even

23   the right word, of the law enforcement agencies who investigated

24   this case.  Now, everything since then seems to be focused on the

25   U. S. Attorney's Office.  Are we just talking about the

1    disqualification of the U. S. Attorney's Office and its staff?

2              MR. ALLEN:  At this time, we certainly are, Your Honor.

3              THE COURT:  All right.  So I don't need to worry about

4    the law enforcement agencies.

5         All right.  Let's hear from the government.

6              MR. WRIGHT:  Your Honor, the United States Attorney's

7    Office opposes their motion -- motions.  The defendants do not

8    cite to a Rule of Professional Conduct that would mandate the

9    recusal of this matter and the defendants do not cite to a

10   statute that would mandate it.  Mr. Southern has, in his reply

11   memorandum, extensively relied upon the U. S. Attorney's Manual

12   and we dealt with that at the bench.

13        In my response that I provided to the Court about our

14   compliance with the U. S. Attorney's Manual and with the

15   consultation of officers, but I should also note this, that with

16   respect to the U. S. Attorney's Manual, these former prosecutors

17   skipped over the very first section of the U. S. Attorney's

18   Manual, Section 1-1.000.  The manual provides only internal

19   Department of Justice guidance.  "It is not intended to, does

20   not, and may not be relied upon to create any right, substantive

21   or procedural, enforceable at law by any party in any matter,

22   civil or criminal," and that provision is not just something that

23   Courts ignore.

24        We cited to the case of *United States v. Lorenzo*, 995 F.2d

25   at 1453 from the Ninth Circuit, and there are numerous other

1    cases that cite to that provision and decline to apply the U. S.

2    Attorney's Manual as a basis for a recusal or for some other

3    action complained of by a defendant.

4        There was also a discussion in Mr. Southern's reply

5    memorandum about how this case is similar to the *Oklahoma City*

6    *Bombing* case, where resume's were apparently solicited by the

7    Attorney General and some prosecutor, who was not from Oklahoma,

8    ended up prosecuting the case as the lead Prosecutor.

9        Your Honor, I would refer the Court to, for example, one

10   published opinion, 955 F. Supp. 1281 (1997), with Chief Judge

11   Matsch, who presided over the case, right before trial, issued a

12   pretrial ruling.  There are numerous published opinions in the

13   *United States v. McVeigh* case.

14       The first attorney listed for the government in that case is

15   United States Attorney Patrick Ryan, Western District of

16   Oklahoma, where the bombing occurred.  Oklahoma City lies in the

17   Western District.

18       The next attorney listed is Joseph Hartzler, who I think is

19   the attorney referred to in their briefs as the one selected by

20   Attorney General Reno to lead the prosecution.  He is listed in

21   every opinion I have seen as a Special Assistant to the United

22   States Attorney.

23       It is quite clear that the United States Attorney's Office

24   for the District of Oklahoma, Western District, was not recused

25   from that case and should not be used as an example, or a

1  precedent, or even something that would influence the Courts to

2  recuse this office.  It's a constitutional issue, Your Honor, and

3  it involves serious questions of separation of powers.

4      Can the judicial branch of the government step in and

5  dictate that a certain officer of the United States Attorney's

6  Office that the United States Attorney himself cannot prosecute

7  the case where he has been appointed by Congress pursuant to

8  statute and the authority of the President?

9          THE COURT:  Are you really suggesting I don't have the

10 authority to do this if I find it's appropriate?

11         MR. WRIGHT:  I'm suggesting, Your Honor, that you have

12 to be very, very careful when you do that.

13         THE COURT:  I'm always very careful.

14         MR. WRIGHT:  I'm just making my argument, Your Honor.

15 I'm not suggesting that you wouldn't be.

16         THE COURT:  Well, but in all seriousness, the tenor of

17 that point is that you're suggesting that I don't have the

18 authority to do this at all.

19         MR. WRIGHT:  I didn't say that, Your Honor.

20         THE COURT:  Which I think puts you out on a bit of a

21 limb, doesn't it?

22         MR. WRIGHT:  I didn't say that, Your Honor.  What I'm

23 saying is that the constitution -- we have to find a due process

24 violation and what they're alleging there as due process

25 violations is that because some prosecutors in the office had to

1    drink water out of a bottle for a few days last January, because

2    some prosecutors in the office had to make special arrangements

3    to cook, bathe, wash their clothes for a few days last January,

4    before some prosecutors in the office had to suffer the hardship

5    of smelling a licorice-like odor and everyone was, quote,

6    "concerned," that's what's in their motion.  That's the gist of

7    their argument, Your Honor.

8         But what is the standard?  They've argued about appearance

9    and bias, or appearance of impartiality, and some partiality, I

10   suppose.  That's not the standard.  Their own case that they

11   cite, the *Sigillito* case, says that the standard for recusal of a

12   prosecutor is, is there an actual conflict of interest based on a

13   personal or financial stake in the outcome.

14        I would refer the Court to case of *Wright v. The United*

15   *States,* 732 F.2d at 1048.  Is the prosecutor using the awful

16   instruments of the criminal law for the purposes of private gain?

17   Does the prosecutor have an axe to grind based on the fact that

18   he serves two masters, that he's under the influence of others?

19        The *Young* case, Your Honor, that is a very unique case.

20   That's where the Court selected the prosecutor for a contempt

21   action, and there was much discussion in that case as to whether

22   the Court has the authority to do that and the Supreme Court

23   said, yes, in order to vindicate the judicial branch's own

24   authority, where the U. S. Attorney's Office declines to

25   prosecute, the Court can appoint one.  Well, in that case, they

1    appointed someone who had an interest in the case because he

2    represented the litigant who was harmed by the allegedly

3    contemptuous action.

4         That's not what we have here, Your Honor.  The equivalent

5    here would be if you appointed an attorney for someone who filed

6    a claim or sued Mr. Southern or Mr. Farrell.  If you appointed an

7    attorney for the water company, for example.  Not here, not the

8    presidentially appointed U. S. Attorney.  *Ganger,* I'm not sure if

9    I'm pronouncing it right, *G-a-n-g-e-r v. Peyton*, Fourth Circuit

10   case, 379 F.2d at 709, the prosecutor was going after a defendant

11   for an assault charge.  He also represented the wife, who was the

12   victim of that assault, and was divorcing her husband, the

13   defendant, so the prosecutor was the prosecutor on the assault

14   case, and the prosecutor represented the wife in the divorce

15   case, serving two masters.

16        I go back to a case called *Tome v. United States.*  It didn't

17   involve a prosecutor.  It's a 1927 case, Your Honor.  The mayor

18   in a judicial or quasi judicial function was levying fines that

19   funded his salary.  He should not have done that.  He should have

20   been recused from overseeing those kinds of actions.  He wasn't

21   even a prosecutor.

22        What is not serving two masters?  Well, again, the *Wright*

23   case gives us an example.  There, a prosecutor was married to a

24   woman who carried out loudly and publicly a campaign against the

25   defendant to investigate the defendant, and then he married --

1     the prosecutor married this woman.  They said that that did not

2     rise to the level of a due process violation.

3          The standard actual financial stake in the matter, personal

4     or financial stake in the matter, has some limiting factors, Your

5     Honor.  First, I know the defendants have been using the words

6     "impartiality", and "unbiased", and "neutral prosecutor".

7     Prosecutors, though, are not held to the same standard of

8     impartiality that one would expect from a judge, and that's why

9     it's quite remarkable to hear the defendants say, well, we'll

10    waive any conflict by the judge, who is supposed to be even more

11    impartial than a prosecutor.  Prosecutors can't be impartial.

12    They are advocates in an adversary system.

13         And, to quote *Marshall v. Jerrico*, "necessarily permitted to

14    be zealous in their enforcement of the law."  The Supreme Court

15    in that case said, "The rich requirements of *Tome*," in another

16    case, "designed for officials performing judicial or quasi

17    judicial functioning are not applicable to those acting in a

18    prosecutorial capacity."  That's 446 U. S. Reporter at Page 248.

19         Again, from the *Wright* case, "To honestly convince of a

20    defendant's guilt, the prosecutor is free; indeed, obliged to be

21    deeply interested in urging that view by any fair means."  That's

22    the *Wright v. United States* case.

23         Another limiting factor here to be applied, Your Honor, is

24    that the personal or financial stake cannot be remote and

25    insubstantial.  That's a principle enunciated by the Supreme

1    Court in the *Aetna Life Insurance* case and that was cited in

2    their brief, in which they didn't deal with at all in their

3    replies or in argument, 475 U. S. at 846.  In that case, six

4    justices of the Alabama Supreme Court who were participants in a

5    class action did not have to be recused, according to the Supreme

6    Court.  The Court held that, with respect to those six justices,

7    there's no basis for recusing those justices under the due

8    process clause based on their not withdrawing from the class

9    action.  While the justices may have had a slight pecuniary

10   interest, it was impossible to characterize that interest as

11   direct, personal, substantial and pecuniary.  Any interest that

12   they had was highly speculative and contingent, given that the

13   trial court had not certified a class that awarded any relief of

14   a pecuniary nature.

15       There has to be, in other words, some element of

16   practicality and reality to this idea that the prosecutor should

17   be recused.  Here, the class action, there won't even be a

18   hearing on whether to certify the class until September, and then

19   the judgment of the plaintiffs who are actually bringing the

20   case, it could be years before there's any resolution to the

21   cases.

22       What they've said, at least in their briefs, is they say the

23   actual conflict, punitive membership in a class.  Well, Your

24   Honor, I just dealt with that.  If six justices, who are required

25   to be more impartial than any prosecutor should not be recused

1    under the due process clause, I'm not sure why any prosecutor who

2    might be a member of a class, that might be certified, and that

3    might come to resolution years from now should also be recused.

4         Claimants in the bankruptcy case, again, Your Honor, if Mr.

5    Majestro, and I don't know that he has, I haven't seen that, has

6    filed some claim that would reportedly cover everybody in Kanawha

7    County and the surrounding counties that were affected by this

8    so-called water crisis, I can't speak to that, other than to

9    refer back to the *Aetna* case.  But I do know this:  That none of

10   the prosecutors that are involved in this prosecution have filed

11   a claim in a Bankruptcy Court, and we cannot file a claim in a

12   Bankruptcy Court given the bar date set by the Bankruptcy Courts,

13   which I believe passed in August of 2014.

14        Mr. Carey cited to, I believe it's 18 United States Code

15   Section 3771, a Crime Victims Rights Act statute.  It talks about

16   victims who have been directly and proximately harmed.  Your

17   Honor, we can find no case that has used 18 United States Code

18   3771, or what might be viewed as a predecessor statute, I believe

19   it's 42 United States Code 10607, as the basis for a recusal of

20   the United States Attorney's Office because they fall under that

21   definition.

22        Would anyone in the United States Attorney's Office be

23   entitled to restitution?  Your Honor, again, I think we would

24   have to go back and determine whether it's real and substantial,

25   specifically with respect to restitution.  Outside the bounds of

1    a plea agreement, restitution could be awarded in this case, A.,

2    as a condition of probation; B., as a condition of supervised

3    release.  That's it under -- for the Title 33 offenses.

4        What would be the basis?  Under the case law, Your Honor,

5    going back to *Hughey v. The United States*, a 1990 Supreme Court

6    case;  *United States v. Blake*, 81 F.3d 498, a Fourth Circuit case

7    that should be familiar to at least Mr. Wilkins, since he

8    authored the opinion; or the *Freeman* case, 741 F.3d 426, a Fourth

9    Circuit case from last January.  These cases suggest that the

10   Court could only impose restitution based on conduct underlying

11   elements of the offense, and they give many examples of how those

12   restitution statues are narrowly construed.  For example, someone

13   whose firearm was stolen, but then the defendant is found guilty

14   of possessing a firearm, is not entitled to restitution for any

15   damage done to his house while the guy stole a firearm.

16       I point out these cases not to suggest, Your Honor, that the

17   Court needs to, or should even try, at this point, to figure out

18   what harms can be said to be directly and proximately caused by

19   the defendant's conduct if they are to be convicted.  It's way

20   too early for that.

21       I should also note, Your Honor, that there is case law under

22   the State of West Virginia dealing with the alleged contamination

23   of public water supply found to be constituting a public

24   nuisance, not a private nuisance and, in order for a plaintiff to

25   recover for a public nuisance, the plaintiff must demonstrate a

special injury different in kind and degree from that of the
general public.  The case I cite for that, Your Honor, is *Rhodes
v.* E.I. du Pont de Nemours and Company, 657 F.Supp.*2d 751*, with a
discussion at 768 and 769, Southern District of West Virginia
from 2009.  Their whole argument is predicated that we're no
different from 300,000 other people, the general public.

I don't believe that, Your Honor.  If you were to look at
all of the claims, there are people who are claiming actual
physical harm.  There are people who are claiming that they've
lost their businesses and suffered millions of dollars worth of
damages.  No one here is anywhere close to all of those types of
claims.

I bring up *Rhodes v. DuPont* in those restitution lines of
cases, Your Honor, only to suggest that even if that were some
slight expectation of restitution, it's too far remote, too
impractical to decide, and too insignificant as a basis for
recusing an entire United States Attorney's Office.

The Supreme Court said it in *Aetna Life Insurance*, Your
Honor, quote, "At some point, the *biasing influence will be too
remote and insubstantial to violate the constitution."  Aetna
Life Insurance*, 106 Supreme Court Reporter at 1588, citing
*Marshall v. Jerrico*, a case that they just cited.  That's where
we are now, Your Honor.

Your Honor, every crime, to some degree or another, affects
everyone in the district, including the prosecutor.  Property

1    values go down if you live in a high crime area.  If somebody

2    robs a bank and then he's fleeing and the police or the law

3    enforcement officers have to shut down sections of the highway in

4    order to find him, you'll suffer an inconvenience.  That could be

5    significant if you have to get to someplace in a hurry.

6        And we have that example in the *Boston Marathon* case.  Four

7    counts of that indictment, Your Honor, a public record,

8    specifically cite to the fact that businesses and citizens were

9    advised not to go out and they had to shut down.  That was the

10   interstate commerce effect for four counts in the *Boston Marathon*

11   indictment in the City of Watertown and the City of Boston for an

12   entire day.  No one could go anywhere, a tremendous inconvenience

13   and a financial harm.  Nonetheless, the U. S. Attorney's Office

14   in Boston is not recused and the Department would not recuse

15   them.

16       Congress, it can be inferred, Your Honor, understood this

17   when it enacted 28 United States Code Section 545, which requires

18   the U. S. Attorney, and his assistants, with some limited

19   exceptions that are not applicable here, to live in the district

20   to which they are appointed to work in.

21       It is contemplated, even desired, that the federal

22   prosecutors in the U. S. Attorney's Office understand the

23   environment in which they live and work, with all of its

24   hardships and all of its inconveniences, and to simply say that

25   the prosecutors are affected, they must have lost some money

1    somewhere, they must have suffered some inconvenience, is not

2    enough.  There must be an actual personal or financial stake in

3    the matter, such as was present in *Young v. Vuitton*, *Ganger v.*

4    *Peyton*, or the mayor in *Tome v. United States*, a stake that is

5    not remote, a stake that is substantial, to the extent that the

6    Court, based on facts in the record, can say that the prosecutor

7    is serving two masters, that the prosecutor is using the awful

8    instruments of the criminal law for his private gain.

9         We can find no case, and that's where we made the argument

10   that it's unprecedented, where a Court has recognized that an

11   entire U. S. Attorney's Office, in circumstances such as these,

12   should be recused.  We ask the Court not to take such a drastic

13   step and we ask the Court to deny their motions.

14            THE COURT:  All right.  I will given the defendants the

15   last word.

16            MR. CAREY:  May it please the Court.  They begin by

17   saying that we have pointed to no statute or regulation that

18   requires the removal.  The common law requires their removal.

19        But it's worth noting that in the *Burger* case, the Court

20   relied, as part of its analysis, on 18 U. S. C. Section 208,

21   which makes it a crime for a prosecutor or other government

22   official to participate or pursue a case in which he or she has a

23   financial interest.

24            THE COURT:  Let me ask you about that, and this is a

25   question I had going into this, and I think Mr. Wright touched on

1    this considerably in his citation of the *Aetna* case.  Does that

2    interest have to be substantial?  In other words, is there a

3    threshold below which that interest doesn't make a different?

4              MR. CAREY:  Under Section 208?

5              THE COURT:  Or any part of your argument.  I mean, I --

6    that's the point where I decided to ask the question, so that's

7    part of it.

8              MR. CAREY:  I would think there would be a point where

9    the connection is so remote, that it is not found -- it is found

10   not to be a conflict, but I don't believe it's a question of,

11   well, how much are we harmed?  If it's a little bit, you can be

12   in; if it's a little bit more, you can probably stay in.

13     The *Young* case answered that question.  If a conflict is

14   found, you don't look to the gravity of the offense.  If you look

15   at Page -- I believe it's 809 -- they state, "It is true that we

16   have indicated that the standards of neutrality for prosecutors

17   are not necessarily as stringent as those applicable to judicial

18   or quasi judicial officers.  This difference in treatment is

19   relevant to whether a conflict is found, however -- is found,

20   however, not to its gravity once identified.  We may require a

21   stronger showing for a prosecutor than a judge in order to

22   conclude that a conflict exists, but once we have drawn that

23   conclusion, however, we have deemed the prosecutor subject to

24   influences that undermine the confidence that a prosecution can

25   be conducted in a disinterested fashion.  If this is the case, we

1    cannot have confidence in a proceeding in which this officer

2    plays the critical role in preparing and presenting a case for

3    the defendant's guilt."

4        And let me move to *Aetna*.  In *Aetna*, there were members of

5    the Supreme Court.

6            THE COURT:  Of Alabama?

7            MR. CAREY:  Of Alabama.  The case came before them

8    involving a question about either finding out whether a bad faith

9    cause -- or an action against insurance companies exist for a bad

10   faith handling of a claim, or the extension of a previously

11   existing found cause of action where there's been a partial

12   payment of part of the claim, but not the rest of it.

13       While that case was pending, one of the members of the

14   Alabama Supreme Court filed his own personal case against an

15   insurance company for bad faith alleging that they hadn't paid

16   for a mink coat that was damaged or lost.

17       He also filed an additional class action suit on behalf of

18   all persons who recovered under Blue Cross Blue Shield for faith

19   claims handling, and the Supreme Court, on review, the  U. S.

20   Supreme Court said, clearly Embry (phonetic), the guy who filed

21   the lawsuit, the justice who filed the lawsuit over the mink

22   coat, who wrote the per curiam opinion extending the law that

23   really made his claim viable and in which he settled for

24   $30,000.00 afterwards, had a conflict, but they said, as to those

25   who were, quote, "covered by the allegations in the class action

1     suit," the Court noted that all the judges in Alabama are covered

2     by Blue Cross Blue Shield.  They said out of the rule of

3     necessity, we bar recusal, and they said there's nothing in the

4     -- there was nothing in the record that any of the individual

5     justices had a bad faith claim.

6          So, they said their claim, if it existed at all, is too

7     speculative, at this point.  We can't say.  It's too far down the

8     road.

9          In this case, we know that the U. S. Attorney's Office was

10    affected.  It's not a question of speculation whether they were

11    affected.  And there's no question that they are within that

12    group of people who have claims for aggravation and

13    inconvenience, perhaps economic damages for travel to obtain

14    water or go to get -- for bathing or to buy water and other

15    things.  So, these are claims, and you don't say that's too

16    diminimous.

17         And I find it amazing --

18          THE COURT:  Well, let me ask you a question to sort of

19    flush that out, because I'm ready interested in this issue of

20    whether or not it's too diminimous.  Let's say that -- and this

21    is hypothetical, and I know it's going to sound a little

22    ridiculous, but it will get to my point.

23         Let's say that Mr. Goodwin, in the entire course of the

24    water crisis, bought one bottle of water, paid a buck-ninety-nine

25    for one bottle of water.  All right?  Is that substantial enough

1    to disqualify him from this case?

2        MR. CAREY:  If that's the only thing, and you take out

3    the fact that he had the aggravation and inconvenience of having

4    his office closed, if you take out the aggravation and

5    inconvenience for dealing with the issues that arose from that,

6    if you take out the fact that there may be some claim down the

7    road for medical monitoring because he may have drank the water.

8     I mean, there are all kinds of factors that come into play

9    here that you can't just isolate and say one bottle of water

10    isn't enough.  I don't know.

11        THE COURT:  Well, you're missing the point of my

12    question, though.  I'm trying to figure out if this is -- if what

13    you're advocating is an absolute, or if it's a question of

14    degree.

15     Let's say he wasn't annoyed and inconvenienced.  Now, he's

16    kind of a happy-go-lucky guy, so he wasn't annoyed or

17    inconvenienced, and let's say he didn't drink any of the water

18    with MCHM in it, and let's say, therefore, he doesn't need

19    medical monitoring.  All he did was buy one bottle of water.

20        MR. CAREY:  Two points.  One is, you simply look to

21    what the facts are to determine whether there is a conflict.

22    Now, I don't know whether you take evidence on all of those

23    issues that you've just postulated and said that doesn't rise to

24    a level of conflict.

25     What we do know, because what the cases have said, once you

1    determine a conflict, you don't look at the gravity of it and,

2    more importantly, and this is, in part, an answer to your

3    question, they want to suggest that you have to look at whether

4    the prosecutor was using the awful instruments of his office in

5    some former retaliation.

6        The Supreme Court in *Young* specifically rejected that.  We

7    don't look to the gravity, nor do we look at harmless error.  We

8    don't determine whether there was prejudice.  It's because of the

9    appearance that a prosecutor is not disinterested.

10           THE COURT:  So your position is that this is an

11    absolute and it's not a question of degrees?

12           MR. CAREY:  Yes.

13           THE COURT:  All right.

14           MR. CAREY:  I agree.

15           THE COURT:  Fair enough.

16           MR. CAREY:  That is all.

17        There's also a point, which they've left out, and they've

18    said, well, this class action is way down the road and who knows

19    whether anyone is going to get a claim.

20        Well, the point is also this, that if Mr. Farrell and Mr.

21    Southern are convicted of a crime, then they would not be able to

22    defend this liability issue in a civil case because the

23    conviction would be introduced as prima fascia evidence of -- not

24    prima fascia, as evidence of their guilt on the negligence case.

25        And so, that being said, there is a benefit to pursuing a

1      prosecution against these people, even if restitution were not

2      available through the federal system.  Their assets would be

3      subject to satisfaction from the judgment.  And so there are many

4      things that can be gained for the benefit of the class through

5      the criminal prosecution.

6              THE COURT:  Well, and could it be argued that a

7      conviction in this case could enhance the value for settlement

8      purposes, among other things, of the class action case.

9              MR. CAREY:  Yes.  Absolutely.  Absolutely.

10       Finally, I just want to go back to their statement that they

11     shouldn't be disqualified because they had to buy a few bottles

12     of water.

13       I find it amazing that the U. S. Attorney says, "You cannot

14     overstate the disruption that follows from not having clean

15     water."  He didn't say, "the physical harm to the public."  He

16     didn't say "the illnesses which arise."  He has said, "You can't

17     overstate the disruption," and that's exactly what the claim for

18     aggravation and inconvenience are.  They're claims for the

19     disruption that arises and they're part of that 300,000.

20             MR. MOORE:  May it please the Court.  Judge, I'm not

21     going to repeat everything that Mr. Carey said, because I think

22     Mr. Carey said a lot of it better than I could, so I'm going to

23     leave it at that, but there are a few things that I do want to

24     mention.

25       First of all, Mr. Wright, in his argument, talks about the

1    statute that requires U. S. attorneys to live in the district

2    where they practice law and where they enforce the law.  Of

3    course, he fails to mention 28 U. S. C. Section 543, which

4    enables the Attorney General of the United States to send

5    prosecutors to a district when he deems it appropriate and in the

6    public interest.

7        Now, I understand Your Honor's ruling, at least at this

8    stage, about whether we're going to look at other recusal cases,

9    but it seems to me that the U. S. Attorney is talking out of both

10   sides of his mouth when he says, we don't need to get into these

11   other recusal cases but, by the way, let me talk about these

12   cases where Courts did not order recusals.

13       There were a number of cases, and I could get into those at

14   the appropriate time, if Your Honor permits, where it's clear on

15   the record, from Pacer and otherwise, that a recusal has been had

16   by the United States and where a United States Attorney's Office

17   has been completely recused.

18       I understand Your Honor is familiar with that practice, but

19   for them to say, and still continue to say, that it's

20   unprecedented for a Court to remove a United States Attorney's

21   Office, that may well be true, because most United States

22   Attorney's Offices, one expects, follows the procedures in the

23   United States Attorney's Manual with respect to communication

24   with the Department of Justice and we hear them talk about the

25   United States Attorney's Manual and we hear them talk about the

1    fact, in 1.1000, I think is the correct cite, that the U. S.

2    Attorney's Manual confers no rights on private litigants.

3        I would suggest that they protest too much here.  If they

4    communicated with the Department of Justice and provided the

5    Department of Justice, prior to charging our client, with all

6    information that related to their conflict, I doubt we'd be

7    sitting here today in this same situation.

8        With respect to -- and I guess there's one point that I feel

9    like I must repeat, because when you listen to Mr. Wright talk

10   about the minimal impact of this chemical spill on the members of

11   his office, it is hard to imagine how he can say that out of one

12   side of his mouth, when the United States Attorney has said,

13   "It's hard to overstate the disruption that was caused by this

14   chemical spill."

15       To get to Your Honor's question to Mr. Carey about does --

16   does the degree of effect matter, we agree with Mr. Carey that it

17   does not, but Your Honor has already flushed that out, in

18   questions to Mr. Wright, that Mr. Wright's home was affected to

19   some degree.  And, as I understand it, Mr. Wright supervises Mr.

20   Ellis, one of the other attorneys in this case.

21       You look at *Sigillito*, it certainly suggests that when a

22   supervisor in a U. S. Attorney's Office has a conflict, that

23   conflict is imputed to all of the people that he supervises.  If

24   Mr. Goodwin lives in an area where he did not get water, could

25   not get water, and his first assistants live in areas where they

1    were personally affected by the inability to get water at their

2    homes, to bathe at their homes, to wash clothes in their homes,

3    then every person in that office, because they're supervisors,

4    their conflict is imputed to everyone else in that office and, if

5    we have to get to the matter of whether the degree of impact or

6    injury matters, then we can't take discovery in this case.  We

7    can't depose the United States Attorney, the First Assistant

8    United States Attorney, members of their families, if that is

9    necessary.

10        However, we suggest, and we end with, we go back to 18 U. S.

11   C. Section 3771.  It says that, "For all crimes, a person is a

12   crime victim if they are directly and proximately harmed by the

13   event that is charged."  I do not know how this office can claim

14   that they are not crime victims.  They haven't credibly claimed

15   that they are not crime victims.  And one cannot prosecute a case

16   where one is also the victim of a crime.

17        It strains common sense to argue that you can be a victim

18   and prosecute the case, and I know of no precedent, no Court,

19   that has ever allowed that to happen.  That's my concluding

20   point, Your Honor.

21            THE COURT:  Well, you would agree with me that it's

22   possible for the U. S. Attorney, for example, to be recused from

23   a matter, but not the rest of the office?

24            MR. MOORE:  Yes, sir.

25            THE COURT:  That happened to me when I was U. S.

1    Attorney.

2         MR. MOORE:  That happens on occasion, depending on the

3    nature of the conflict.  There are occasions when the Justice

4    Department decides that, based on the United States Attorney's

5    personal conflict, they will recuse an entire office because --

6    and it perhaps does --

7         THE COURT:  I had both things happen to me when I was

8    U. S. Attorney.  I had one case where I was personally recused,

9    but the office was not, and my Criminal Chief was appointed as

10   the acting U. S. Attorney for that case.

11     Another case where I had a conflict, and it was a little bit

12   different kind of conflict, but they took the whole office off

13   the case.  It happened to me both ways, in that there were

14   distinctions in those two sets of facts, but you would agree with

15   me that, at least in some circumstances, the basis of the recusal

16   does not necessarily extend to the entire office?

17       MR. MOORE:  The basis of the recusal does not necessarily

18   extend to the entire office.  However, I would say, Your Honor,

19   that when the United States Attorney is a victim of a crime and

20   the First Assistant United States Attorney is the victim of an

21   alleged crime, and the Supervisory Assistant United States

22   Attorney who has supervisory authority over the prosecution of

23   this case is a victim of a crime, in those circumstances, and

24   then you -- if you looked at the individual conflicts of other

25   people in the U. S. Attorney's Office, I think you are left with

1    the inescapable conclusion that, in this case, this office must

2    be in conflict.

3              THE COURT:  All right.  Does anybody else have any

4    other argument today?

5              MR. WRIGHT:  Your Honor, I'm not going to add argument,

6    but could I ask the Court, if I may make, just for reference,

7    exhibits -- as exhibits, the documents that we refer to in our

8    memo and, specifically, I'm talking about either orders or

9    pleadings that were filed either in the civil cases or the

10   bankruptcy case?

11             THE COURT:  Is there any objection?

12             MR. CAREY:  What was the last one you said?

13             MR. WRIGHT:  It would be ECF Document 39.

14             MR. CAREY:  I just didn't hear the last word you said.

15             MR. WRIGHT:  I referred to them in our memo.

16             MR. CAREY:  I have objection.

17             MR. WILKINS:  No objection.

18             MR. ALLEN:  No objection.

19             THE COURT:  All right.  Well, those will be -- I will

20   order that those be placed in the record without objection.

21        All right.  We do have this other issue that we discussed

22   here at the bench.  How do we want to tee that up?  The

23   government has filed a Motion to Quash.  We can use that as a

24   vehicle to tee this up.  How would we like to proceed?

25             MR. ALLEN:  Your Honor, we were served with this just a

1    few moments before this proceeding started.  We could file a

2    response to the Motion to Quash, if the Court would like, and I

3    wasn't part of the --

4              THE COURT:  Well --

5              MR. ALLEN:  Excuse me, Judge.

6              THE COURT:  Go ahead, Mr. Allen.

7              MR. ALLEN:  I wasn't a part of the bench conference, so

8    I'm not sure exactly what all was discussed up here, so maybe --

9              MR. ALLEN:  I think that the bottom line, Your Honor,

10   is they filed a motion.  To tee it up, we could file a response.

11   In our response, we may go beyond responding simply to the motion

12   to quash the subpoena of Judge King and deal with the issues of

13   relevance and deal with the issues of the Rule of Professional

14   Conduct generally, and then we can proceed.

15             THE COURT:  Well, I'm going to give the government an

16   opportunity to amplify its position on the motion because this is

17   a two-page motion.  That's -- it briefly -- I see it briefly,

18   very briefly outlines the government's position on this, but I'm

19   going to give them an opportunity to file a more lengthy

20   memorandum, and you all may have a response, and they can have a

21   reply.

22        How much time do you need to file -- first of all, Mr.

23   Wright, do you want to file an additional memorandum?

24             MR. WRIGHT:  Your Honor, if the Court feels like that

25   that would be necessary to rule on their motions to recuse our

1    office then, yes, we would like, I would say, another ten days, a

2    week from this coming Friday, to file some sort of memorandum and

3    I would -- I would like, I have just been informed, after this

4    hearing started, that there was a subpoena served on another

5    former United States Attorney, Warren Upton.  I haven't seen

6    that.  I wasn't told directly, but I've learned that that

7    happened and, if that's happened, then we would move to quash

8    that subpoena under the same grounds.

9              MR. ALLEN:  The motion -- or the subpoena served on Mr.

10   Upton, he was defense counsel.  He was not a member of the

11   Department of Justice at the time of the event that we were going

12   to ask him about.  Bob King was on one side, Warren Upton on the

13   other side.  Both of them relate to the FMC ruling.

14             THE COURT:  Well --

15             MR. ALLEN:  So the United States would not have been

16   his client at that time.

17             THE COURT:  All right.  Well, I'm going to give the

18   government -- you know, I expressed my reservations about this at

19   the bench, but the defendants are intent on pursuing this, so I'm

20   going to give them an opportunity to be heard on it, and I'm not

21   going to make any findings on it at this time, which means we can

22   brief this.  So, you can have until a week from Friday.

23        How long does the defense need?  That would be the 16th.

24   How long does the defense need after that to file a response --

25   or responses?

1          MR. ALLEN:   Another ten days, Your Honor.

2          THE COURT:  All right.  So that would be the 26th.

3          MR. ALLEN:  Yes, sir.

4          THE COURT:  I want to make sure that's a -- is that a

5   weekday?

6      Okay.  Then how long for a reply?

7          MR. WRIGHT:  Following Wednesday, Your Honor, the

8   Wednesday day after they file?

9          THE COURT:  Two days later?  I'm looking at a -- I

10  think I'm looking --

11         MR. WRIGHT:  Oh, I --

12         THE COURT:  26th is a Monday, so that would be the

13  28th.

14         MR. WRIGHT:  Could we have until Friday, Your Honor?

15         THE COURT:  That would be the 30th.

16         MR. WRIGHT:   Yes, Your Honor.

17         THE COURT:  All right.  That's fine.  That's fine.

18     All right.  Anything else we can take up today?

19         MR. ALLEN:  Your Honor, in light of the briefing

20  schedule and the fact that this motion has not been resolved at

21  this particular point in time, which we think is of

22  constitutional magnitude, I would ask that the Court stay all

23  further proceedings, including the arraignments and so forth of

24  Mr. Southern, until this matter has been ruled on.

25         THE COURT:  Well, first of all, I am going to take the

 1    motion for disqualification under advisement.  I'm going to deny

 2    that motion.  Right now, the only thing I know of that's

 3    scheduled is the arraignment on Thursday.  There's not much harm

 4    in re-arraigning somebody, if that becomes necessary and, until

 5    the motion is granted, the U. S. Attorney's Office is still in

 6    this case and the case is going to proceed, and I should say if

 7    and when, until we reach a point where the motion might be

 8    granted, the U. S. Attorney's Office is still in this case.

 9        So, we might re-visit that at later time, if it seems

10    efficient to do so, but I want -- I intend to rule on this as

11    quickly as possible, for obvious reasons, and so, for right now,

12    that motion will be denied.

13        Anything else we need to take up today?

14            MR. WRIGHT:  May I approach with the exhibits?

15            THE COURT:  You may.  You can just -- you can do that

16    after the hearing.  Just provide those to the courtroom deputy up

17    here.

18        All right.  Thank you.

19            MR. MOORE:  Your Honor, I'm sorry.  Just one quick

20    moment.

21        On this discovery issue, I take it Your Honor will let us

22    know if you believe that we need an evidentiary hearing or if

23    Your Honor will consider our request to take discovery from the

24    United States Attorney's Office; is that correct?

25            THE COURT:  You can file a motion as to that and I will

1    consider it.

2                MR. MOORE:  Yes, sir.

3                THE COURT:  All right.

4                MR. MOORE:  Thank you.

5                THE COURT:  Thank you.

6           (Proceedings concluded at 3:08 p.m., January 5, 2015.)

7

8    CERTIFICATION:

9        I, Ayme A. Cochran, Official Court Reporter, certify that

10   the foregoing is a correct transcript from the record of

11   proceedings in the matter of United States of America, Plaintiff

12   v. Dennis P. Farrell & Gary L. Southern, Defendants, Criminal

13   Action No. 2:14-cr-00264, as reported on January 5, 2015.

14

15   s/Ayme A. Cochran, RMR, CRR                February 16, 2015

16   Ayme A. Cochran, RMR, CRR                          DATE

17

18

19

20

21

22

23

24

25