```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON

_____x
                                :
UNITED STATES OF AMERICA,       :      Criminal Action
                                :
             Plaintiff,         :      No.  2:14-cr-00264
                                :
v.                              :
                                :      Date:  June 1, 2015
DENNIS P. FARRELL and           :
GARY L. SOUTHERN,               :
                                :
             Defendants.        :
_____x


         TRANSCRIPT OF PORTION OF TESTIMONY OF WITNESS,
                         REX REPASS
         BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
                  UNITED STATES DISTRICT COURT
                  IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:         AUSA PHILIP H. WRIGHT
                            AUSA LARRY R. ELLIS
                            AUSA ERIC P. BACAJ
                            U.S. Attorney's Office
                            P.O. Box 1713
                            Charleston, WV  25326-1713

For the Defendants:         MICHAEL W. CAREY, ESQ.
                            S. BENJAMIN BRYANT, ESQ.
                            Carey Scott Douglas & Kessler
                            P. O. Box 913
                            Charleston, WV  25323

                            MARK C. MOORE, ESQ.
                            Nexsen Pruet
                            7th Floor
                            1230 Main Street
                            Columbia, SC  29201

                            ROBERT B. ALLEN, ESQ.
                            Kay Casto & Chaney
                            P. O. Box 2031
                            Charleston, WV  25327-2031
```

```
Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1   PARTIAL PROCEEDINGS had before The Honorable Thomas E.
2 Johnston, Judge, United States District Court, Southern District
3 of West Virginia, in Charleston, West Virginia, on June 1, 2015,
4 as follows:
5       (Prior proceedings preceded the following.)
6          **REX REPASS, DEFENSE WITNESS, PREVIOUSLY SWORN**
7       (The following includes a portion of questioning of the
8 witness by the Court.)
9           THE COURT:  I've got a couple of questions for you.
10          THE WITNESS:  Yes, sir.
11          THE COURT:  The phone numbers that you use to make
12 these calls --
13          THE WITNESS:  Uh-huh.
14          THE COURT:  How did you come up with those phone calls?
15          THE WITNESS:  There are companies -- there are
16 companies in the U. S. and globally that provide random digit
17 telephone samples for public opinion and marketing research
18 firms.  One is called Survey Sampling, Incorporated, and -- but
19 there are many, so we purchase lists from companies that provide
20 samples.
21          THE COURT:  And these are randomly generated numbers?
22          THE WITNESS:  Yes, and each interviewer is working from
23 a replicate, so that interviewer is working from a near exact
24 sample of the entire -- the entire area.  So, a -- if one
25 interviewer is -- wouldn't just be calling a Charleston Division,

1  for example, they're calling throughout, because they have a
2  replica of the sampling frame that they're working from that's
3  loaded into a -- their computer and the number comes up every
4  time they are ready to dial.
5           THE COURT:  Well, it's not entirely random because each
6  number is going to start with 304, correct?
7           THE WITNESS:  That's true.  Every number will start
8  with 304, but the prefix, the 342, those are randomized into the
9  -- into the sampling frame.
10          THE COURT:  Well, I'm assuming that if that's entirely
11 randomized, then you're going to have some prefixes that don't
12 actually exist in Southern West Virginia, or exist in the
13 Northern District of West Virginia, for example.  How are those
14 done?
15          THE WITNESS:  Well, you can purchase a sample based on
16 not only the area code, but the prefix, or the county, or the
17 zip, or the block code, the Census block code.  So, you can
18 purchase samples very finely.
19      So, when you purchase a sample for Kanawha County, for
20 example, it is -- the distribution of phone numbers are
21 consistent with the population distribution and the phone line --
22 land line distribution in the county.  The cell phone sample is a
23 little different than that, but for the land line, that's how the
24 sample is selected.
25          THE COURT:  So these are existing numbers that are

```
 1    randomly selected?
 2            THE WITNESS:  Correct.
 3            THE COURT:  All right.  And the company from whom you
 4    purchased those numbers, to what extent, if you know, are those
 5    numbers a comprehensive list of all numbers, land line and cell,
 6    in the Southern District of West Virginia?
 7            THE WITNESS:  I don't know the answer to that, but when
 8    we -- we buy telephone samples all the time and we match it up
 9    against the demographics of an area.  You know, we look at the
10    classification data, the age, income, education level, and
11    compare and contrast the data from those telephone interviews.
12    So, the sample -- I can't answer that technical question
13    specifically, but my experience is that when we select, whether
14    it's for Maricopa County, Arizona or Kanawha County, West
15    Virginia, the distribution of telephone numbers is consistent
16    with the population distribution that has land lines.  Then, we
17    shuffle with the cell phone.
18            THE COURT:  In other words, you know -- there's a known
19    quantity of the percentage of the population that has a land line
20    and that is the same percentage, more or less, that's appearing
21    in the list that you get?
22            THE WITNESS:  Yes.  We -- we know that and, again, this
23    is a broad number, not exact, but about 70 percent of households
24    have land lines; about 30 percent do not.
25            THE COURT:  And --
```

```
1                    THE WITNESS:  So --
2                    THE COURT:  How does internet-based telephone play into
3      that?
4                    THE WITNESS:  Like Voice over IP?
5                    THE COURT:  Yes.  Is that considered a land line?
6                    THE WITNESS:  It is, because that number is a listed --
7      typically a listed telephone number.
8                    THE COURT:  All right.  Then, to the extent that your
9      survey indicated that the respondents are registered voters, that
10     is by self-report --
11                   THE WITNESS:  Correct.
12                   THE COURT:  -- from the respondent, correct?
13                   THE WITNESS:  That's correct.  That's self-reporting.
14                   THE COURT:  So you weren't using a voter registration
15     database or anything like that?
16                   THE WITNESS:  No, we are not.  We are asking, "Are you
17     registered?"
18                   THE COURT:  Is there any bias in that?  In other words,
19     is there a bias to the respondents to say that they're registered
20     when they actually aren't because there's some negative inference
21     that can be raised by not being registered to vote?
22                   THE WITNESS:  There can be.  There can be.  But my --
23     and we don't do work for candidates for public office.  I did
24     many years ago in my career, when we did public opinion polling
25     for the media, and my experience is, when we've done -- conducted
```

1   the polling for the news media in this state, that --
2   specifically, for the Charleston Daily Mail -- you compare our
3   profile, our demographic profile, of registered voters that we're
4   asking a political question about.  It's very consistent with
5   when you look at the demographic profiles after the fact, you
6   know, looking at Secretary of State data or -- and go back and
7   compare it, and it's very similar.
8           THE COURT:  When you talk about cognitive dissonance,
9   and I remember cognitive dissonance was something I studied when
10  I was in school, and I remember it a slightly different way.
11  Maybe you can explain.  Maybe I'm having cognitive dissonance
12  about cognitive dissonance, but my recollection of it was a
13  concept of a -- a psychological concept where what people
14  believed and what they did were not necessarily consistent.
15      And I remember the example my professor gave was, and this
16  may not have been true back in the 40s and 50s, but by the 80s,
17  when I was in school, most people, including smokers, believed
18  that smoking was bad for you and, yet, the smokers continued to
19  smoke, and that was given as sort of a prototypical or a -- as a
20  typical example of cognitive dissonance.  Is that the same
21  concept that you're discussing?
22          THE WITNESS:  It is, and also, the tobacco example is a
23  good one.  People use that a lot to describe cognitive
24  dissonance, but it also suggests that we have an inner drive to
25  kind of hold our beliefs internally, and it takes a lot to change

1 that point of view.
2     So, the smoker doesn't believe. The smoker doesn't believe
3 the scientific data on -- or they choose to ignore it, the
4 scientific data that supports the carcinogens in cigarettes.
5         THE COURT: There's a big difference between those two
6 concepts, though. Not -- refusing to believe it and choosing to
7 ignore it are two different things, are they not?
8         THE WITNESS: They are, but you're also -- and some of
9 the theory is that information that is contrary to your point of
10 view, to your opinion, your attitude, your belief in something,
11 you tend to discount, and you tend to gravitate toward
12 information that is supportive of your bias, your belief about a
13 topic. That's part of the theory on cognitive dissonance and, at
14 least in communication strategy, and that's how I'm trained,
15 communications effects.
16         THE COURT: All right. Last question I have relates to
17 a point the Government asked some questions about and raised in
18 their briefing, and that is that in -- it's -- there's a question
19 of sequence with regard to the survey you did, and that is that
20 Freedom Industries, the company, entered a plea of guilty as a
21 company.
22         THE WITNESS: Uh-huh.
23         THE COURT: Just a -- maybe two or three weeks before
24 you began your survey. What, if any, impact might that have on
25 the validity of the results that you reach for the purposes of

1  this proceeding?
2  THE WITNESS: From my perspective, it would have little
3  impact on the credibility of the data, because to what degree was
4  there specific recall of the entry of a guilty plea? I don't
5  know what that is, but my experience tells me and, again, based
6  upon the strength of the data, these 70, 69, 70, up to
7  78 percent, percentile numbers, and the consistency after 100,
8  200, 300, 400 interviews, that this data would hold.
9  If we would have done that pre-entry of that guilty plea or
10 post-entry of that guilty plea, I don't think there would be any
11 difference in the data from my, you know, my opinion.
12 THE COURT: Do you have -- are there ways in the data
13 that you can control for that and reach that conclusion?
14 THE WITNESS: Well, the only -- there's not a -- there
15 was not a control. We did not -- it wasn't a controlled --
16 THE COURT: Well, maybe I shouldn't have thrown that
17 term in. My question is, is there something in the data --
18 THE WITNESS: Uh-huh.
19 THE COURT: -- that tells you that -- that supports
20 your opinion that would have no impact on the validity of the
21 data?
22 THE WITNESS: We had a discreet question or two, you
23 know, discreet -- again, by "discreet question", I mean, often,
24 we will have a question in a study like this. We're trying to
25 see where does the public or consumer audience fall on a question

1 that has two points of view.
2 　　If you're arguing two points of view, where does the public
3 fall on that question? And we had a question like that in here
4 and it was specifically about -- let me find it real quick.
5 　　The discreet question was, we posed two points of view to
6 the respondent, and one of the responses they could give was did
7 they believe errors were made by executives of Freedom Industries
8 or just, they happened, and out of no fault of anyone that they
9 happened, they're just a mistake happened; or do you believe that
10 those executives of Freedom Industries essentially made errors
11 and should be punished?
12 　　So, it's two very -- I understand that they're biased points
13 of views, but we -- that data, 69 percent said that the public,
14 the jury public, said that the defendants in this case should be
15 held accountable, should be punished for what happened. So, that
16 is also a piece of data that's similar to the 70 percent to
17 78 percent who indicated that the defendants were guilty.
18 　　So, that's another validating piece of information that I
19 would look at, as a researcher, to support the validity over all
20 of the data. I bet -- we didn't do that, but I bet if we ran a
21 correlation analysis between that question that I just mentioned
22 and the guilt question, you would see a strong correlation in
23 those responses.
24 　　(Portion of transcript concludes.)
25 　　(Further proceedings held thereafter.)

```
 1  CERTIFICATION:
 2      I, Ayme A. Cochran, Official Court Reporter, certify that
 3  the foregoing is a correct transcript from the record of
 4  proceedings in the matter of United States of America, Plaintiff
 5  v. Dennis P. Farrell and Gary L. Southern, Defendants, Criminal
 6  Action No. 2:14-cr-00264, as reported on June 1, 2015.
 7
 8  s/Ayme A. Cochran, RMR, CRR                        June 3, 2015
 9  Ayme A. Cochran, RMR, CRR                                  DATE
10
```