IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:14-cr-00264

DENNIS P. FARRELL and
GARY L. SOUTHERN,

                Defendants.


**MEMORANDUM OPINION AND ORDER**


      Defendants Dennis P. Farrell and Gary L. Southern are former officials of Freedom Industries, Inc. ("Freedom"), a West Virginia corporation that stored, sold, and transported industrial chemicals.   Federal criminal charges have been filed against them in connection with a chemical spill by Freedom that occurred last year in this district and contaminated drinking water for an estimated 300,000 West Virginia residents.

      In December, 2014, the Defendants filed motions to disqualify the United States Attorney's Office for the Southern District of West Virginia.  (ECF 7, 22, and 25.)  The Defendants argue that, because members of the United States Attorney's Office were among those affected by the spill, that Office should be disqualified from prosecuting this case.

      For the reasons set forth below, the Court **DENIES** the motions to disqualify.

## *I. BACKGROUND*

On January 9, 2014, it was discovered that a chemical substance used in the coal-mining industry, 4-methyl-cyclohexane-methanol (MCHM), had leaked from Freedom's chemical storage tank in Charleston, West Virginia, into the Elk River.[1]  One mile downriver was an intake for a water treatment and distribution plant owned by West Virginia American Water Company ("WVAWC") that supplied water to homes and businesses in nine counties in Southern West Virginia.  WVAWC issued a "Do Not Use" order directing residents living in affected areas not to use tap water for drinking, cooking, washing, or bathing.  West Virginia's governor declared a state of emergency.  The chemical spill left approximately 300,000 West Virginia residents without clean water for days.  Clean water was restored in some areas within five days of the spill and in all areas within eight days.

During this water crisis, schools and businesses in the affected areas temporarily closed. Businesses suffered revenue losses, and workers lost wages.  Many residents of Southern West Virginia were forced to purchase bottled water.  Many also traveled to non-affected areas to bathe and wash clothes.  Several hundred people were treated in West Virginia hospitals for symptoms thought to be caused by the contaminated water, including skin rashes.  The chemical spill and its aftermath garnered extensive local and some national media attention.

After the chemical spill, numerous lawsuits were filed against Freedom and the Defendants.  Among them is a consolidated class action lawsuit seeking recovery for alleged personal injuries and economic losses and requesting medical monitoring funded by the defendants.  On January 17, 2014, as a result of the numerous lawsuits, Freedom filed for

---

[1] On January 21, 2014, it was reported that a second chemical, a mixture of polyglycol ethers, had also been released during the spill.  (ECF 164-1 at 1.)

Chapter 11 bankruptcy protection.

On December 17, 2014, a grand jury returned an indictment charging the Defendants with negligent discharge of a pollutant in violation of the Clean Water Act, negligent discharge of refuse matter in violation of the Refuse Act, and negligent violation of an environmental permit.   Southern has also been charged with bankruptcy fraud, wire fraud, making a false oath, and fraud by interstate commercial carrier, all in connection with his participation in Freedom's bankruptcy proceedings.[2]

The Defendants moved to disqualify the entire U.S. Attorney's Office for the Southern District of West Virginia, arguing that all or most members of the Office were likely to have been impacted in some way by the water crisis, creating a conflict of interest or the appearance of a conflict of interest.   (ECF 7, 22, and 25.)   At a hearing on the motions held on January 5, 2015, the Court inquired as to specific harms affecting specific prosecutors.   Two Assistant U.S. Attorneys participating in the prosecution of this case, Eric P. Bacaj and Larry R. Ellis,

---

[2] On December 8, 2014, the United States filed a Criminal Complaint charging Southern with bankruptcy fraud, making a false oath in a bankruptcy case, and wire fraud, in connection with statements made by Southern at hearings in Freedom's bankruptcy case and a document electronically filed with the bankruptcy court.   (ECF 3.) On December 17, 2014, a grand jury returned a thirteen-count Indictment against Southern and Farrell.   The Indictment charges the Defendants with one count each of negligent discharge of a pollutant in violation of the Clean Water Act, negligent discharge of refuse matter in violation of the Refuse Act, and negligent violation of an environmental permit.   (ECF 8.)   In addition, the Indictment charges Southern with six counts of bankruptcy fraud, one count of wire fraud, and three counts of making a false oath in a bankruptcy case.   Finally, the Indictment seeks the forfeiture from Southern of personal accounts worth $7.95 million, in addition to real property and an automobile.   On January 21, 2015, a fourteen-count Superseding Indictment was returned in this case, adding a charge against Southern for fraud by interstate commercial carrier.   (ECF 75.)   On May 12, 2015, the United States filed a fifteen-count Second Superseding Indictment, charging Southern with an additional count of bankruptcy fraud.   The Indictment and Superseding Indictment in this case also charged former Freedom officers William E. Tis and Charles E. Herzing with negligent discharge of a pollutant in violation of the Clean Water Act, negligent discharge of refuse matter in violation of the Refuse Act, and negligent violation of an environmental permit.   On March 16, 2015, Tis and Herzing entered guilty pleas.   They are not named in the Second Superseding Indictment.   On December 17, 2014, Criminal Informations were also filed in separate criminal cases against Freedom (*United States v. Freedom Indus.*, No. 2:14-cr-275 (S.D.W. Va. filed Dec. 17, 2014)), former Freedom employee Michael Burdette (*United States v. Burdette*, No. 2:14-cr-276 (S.D.W. Va. filed Dec. 17, 2014)), and former Freedom consultant Robert Reynolds (*United States v. Reynolds*, No. 2:14-cr-277 (S.D.W. Va. filed Dec. 17, 2014)).   Freedom, Burdette, and Reynolds subsequently entered guilty pleas.

stated that they did not reside in an area where the "Do Not Use" order was in effect at the time of the water crisis.

On January 26, 2015, Farrell and Southern moved for the Court to order the U.S. Attorney's Office to respond to discovery requests in order to develop the factual basis for their motions to disqualify.   (ECF 83 and 87.)   On February 27, 2015, the Court held a hearing on the discovery motions.   The Court declined to take the unusual step of ordering the broad, civil-style discovery requested by the Defendants.[3]   However, with a view to developing a record of the specific impact that the water crisis had on the decision-makers in this case, the Court instead ordered that the Defendants and the United States submit a set of proposed written questions to be posed to U.S. Attorney R. Booth Goodwin II, First Assistant U.S. Attorney Carol A. Casto, and supervisory Assistant U.S. Attorney Philip H. Wright,[4] with the final form of the questions to be determined by the Court.   An additional hearing was held on April 1, 2015, to determine the final content of the questions and to resolve any objections thereto.   After the final version of the questions was forwarded to the three government attorneys, answers were submitted in writing and under seal.   Redacted versions of these responses were later unsealed. (ECF 185, 186, and 187.)

According to the questionnaires, all three supervisory attorneys lived in a "Do Not Use"

---

[3] Farrell's motion sought "discovery to be propounded by defendant."   (ECF 83 at 1.)   Southern's motion sought, *inter alia*, to depose the U.S. Attorney and several supervisory Assistant U.S. Attorneys, to receive copies of all email correspondence by and between all members of the U.S. Attorney's Office for the Southern District of West Virginia regarding the impact of the water crisis on their personal and professional lives, and a list and description of every recusal directed by the Executive Office for the U.S. Attorneys and the Department of Justice since 2000 based on the premise than a U.S. Attorney's Office staff member was an actual or potential victim.   (ECF 87 at 17–18.)   The goal, according to Southern, was to ascertain "the total effect of the water crisis on both the USAO as a whole and on individual AUSAs and supervisors so that this Court can have a complete record of the disabling conflicts at issue here."   (ECF 114 at 2 n.2.)

[4] Mr. Wright is both a supervisor within the U.S. Attorney's Office and, in addition to Assistant U.S. Attorneys Larry R. Ellis and Eric P. Bacaj, is also specifically assigned as counsel in this case.

area during the water crisis.   Casto and Wright lacked clean water in their homes from January 9, 2014, until January 14, 2014; Goodwin did not remember how long his home was without water but recalled resuming the use of water in his home within a couple of days.   Wright and his family complied fully with the "Do Not Use" order, while Casto and her spouse used the water for showering, and Goodwin and his family "mostly" complied.   Casto spent $40 on bottled water, Goodwin spent $20 on bottled water, and Wright spent $5 on water; all had to spend some time driving to get clean water and thus incurred some gas expenses.   None of the attorneys missed work, and none relocated as a result of the crisis.   Wright's spouse, a teacher, did not go to work for six days, as school was canceled.   Goodwin spent some time at his family's lake house but reported that he would have gone there anyway.   Goodwin's minor children also spent some days out of school.   All three attorneys reported being inconvenienced by the lack of clean water, but not aggravated or annoyed.   None reported any resulting property damage or medical symptoms suffered by them or the members of their households. All three indicated that neither they nor any members of their household expect to benefit from the class action lawsuit filed in connection with the water crisis and the chemical spill, or to participate in medical monitoring if medical monitoring relief is ordered in the class action.

On May 5, 2015, after the conclusion of this limited discovery, Southern filed supplemental briefing on disqualification motions (ECF 163; *see also* ECF 189), in which Farrell joined (ECF 166).   On May 6, 2015, the Court heard closing arguments on the motions.

The disqualification motions are now ripe for adjudication.

## *II. LEGAL STANDARD*

The prosecutor's unique role was explained in *Berger v. United States*, 295 U.S. 78, 88 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer.

Prosecutors are permitted to be zealous in their prosecution of a crime. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980)). However, prosecutors have a responsibility to seek justice, not merely to convict. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987).

"Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). The authority of federal courts to disqualify attorneys appearing before them derives from their inherent power to "preserve the integrity of the adversary process," *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (citation omitted), and federal government attorneys are "subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State," 28 U.S.C. § 530B. The local rules of this Court provide that "[i]n all appearances, actions and proceedings within the jurisdiction of this court, attorneys shall conduct themselves in accordance with the Rules of Professional Conduct and the Standards of Professional Conduct promulgated and adopted by the Supreme Court of Appeals of West Virginia, and the Model Rules of Professional Conduct published by the American Bar

Association."    L.R. Cr. P. 44.7.

Because of their duty to pursue the public interest, the Supreme Court has recognized the "requirement of a disinterested prosecutor."   *Young*, 481 U.S. at 808 (1987).   An interested prosecutor would not be "in a position to exercise fairminded judgment with respect to (1) whether to decline to prosecute, (2) whether to reduce the charge . . . , or (3) whether to recommend a suspended sentence or other clemency."   *Ganger v. Peyton*, 379 F.2d 709, 713 (4th Cir. 1967).   Although prosecutors are "traditionally accorded wide discretion . . . in the enforcement process," nevertheless, "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."   *Jerrico*, 446 at 249–50.   Moreover, a prosecutor with a conflict of interest "creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Young*, 481 U.S. at 811.

However, "prosecutors may not necessarily be held to as stringent a standard of disinterest as judges."   *Young*, 481 U.S. at 807.   "This difference in treatment is relevant to *whether* a conflict is found, . . . not to its gravity once identified."   *Id.* at 810–11.   "We may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists."   *Id.* at 811.   A biasing influence may be "too remote and insubstantial" to pose a "realistic possibility" of distorting the judgment of officials tasked with prosecutorial functions. *Jerrico*, 446 U.S. at 250–51.   Yet, once a court has concluded that a conflict of interest exists, "we have deemed the prosecutor subject to influences that undermine confidence that a prosecution can be conducted in disinterested fashion," and it is deemed a fundamental error

7

which undermines confidence in the integrity of the proceeding.   *Young*, 481 U.S. at 811.

## III. DISCUSSION

Defendants Farrell and Southern allege that the supervisory attorneys for United States, and most if not all of the members U.S. Attorney's Office for the Southern District of West Virginia, as well as their respective family members, have economic interests in the outcome of this case and are victims of the environmental crimes with which the Defendants have been charged.[5]   They argue that the entire U.S. Attorney's Office for the Southern District of West Virginia should have recused itself from prosecuting this case and, having failed to do so, should be disqualified by this Court.[6]

### A. Supervisory Attorneys' Alleged Pecuniary Interests

The Defendants assert that U.S. Attorney R. Booth Goodwin II and the two other supervisory attorneys, First Assistant U.S. Attorney Carol A. Casto and supervisory Assistant

---

[5]  Southern and Farrell first asserted in their motions to disqualify that all or most of the members of the United States Attorney's Office and their family members suffered inconveniences as a result of the chemical spill—including pecuniary loss; the inability to work for a time; the inability to drink, cook, bathe, wash with, or come into contact with contaminated water; and concerns about the effects of exposure to the chemical by them and their family members.   (ECF 7 at 2, 5; ECF 25 at 4.)   The position appeared to be based not on hard facts but on conjecture grounded in the notoriety of the widespread impact of the water crisis in Southern West Virginia and the temporary closure of the United States Attorney's Office.   Southern repeatedly asserted that "every person in the United States Attorney's Office suffered the same inconveniences and hardships as the other 300,000 plus victims of the water crisis."   (ECF 7 at 2; *see also id.* at 3, 7, 8; ECF 22 at 3, 4, 5.)   However, the statements of the prosecutors in this case at the motion hearing held on January 5, 2015, made it clear that different prosecutors were affected in different ways.   Two of the prosecutors in this case did not live in a "Do Not Use" area during the time of the chemical spill.   Following the limited discovery held as to the effects of the water crisis on the supervisory attorneys, the Defendants subsequently focused their arguments in their supplemental briefing and in their closing arguments at the final hearing on the disqualification motions on the specific impact of the water crisis on the supervisory attorneys, their spouses, and their immediate family members.   (*See* ECF 163 and 166.)   Accordingly, in sections III.A–D, *infra*, the Court focuses on alleged conflicts by the supervisory attorneys.   The Court addresses alleged conflicts by other prosecutors in the U.S. Attorney's Office separately in section III.E, *infra*.

[6]  Southern initially moved to disqualify "the United States Attorney's Office for the Southern District of West Virginia, its agents and investigators." (ECF 7 at 1; ECF 22 at 1.)   At the first hearing on the disqualification motions, Southern abandoned the request to disqualify investigators or any law enforcement agencies and clarified that the focus of his motion is the U.S. Attorney's Office and its staff.

8

U.S. Attorney Philip H. Wright, have a financial stake in the outcome of this case, creating a conflict of interest that requires the disqualification of the entire U.S. Attorney's Office for the Southern District of West Virginia.

If a federal prosecutor participates in a judicial proceeding in which he or she knows that he or she, a family member, or a business partner, has a financial interest, that attorney would be open to a charge of violating the criminal conflict of interest statute, 18 U.S.C. § 208(a).   Such conduct may also violate the legal profession's ethical rules against personal interest conflicts if it would present a significant risk of materially limiting the representation of the client.   *See* MODEL RULES OF PROF'L CONDUCT R. 1.7(a)(2) (2013) (hereinafter MODEL RULES); W. VA. RULES OF PROF'L CONDUCT R. 1.7(a)(2) (2014) (hereinafter W. VA. RULES).   The client in this instance is the United States, "a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."   *Berger*, 295 U.S. at 88.   The potential for prosecutor partiality created by a pecuniary stake in the outcome of a criminal decision may also implicate due process.   The Supreme Court has held that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."   *Jerrico,* 446 U.S. at 249–50.   The Fourth Circuit has also held that due process is violated when a prosecutor has a pecuniary interest in the outcome of a criminal case that threatens to deny a defendant "the possibility of fair minded exercise of the prosecutor's discretion."   *Ganger*, 379 F.2d at 712, 714.

### 1. Class Action Lawsuit

The Defendants argue that a conflict of interest exists because the supervisory

government attorneys are putative members of a consolidated class action suit currently pending before another judge in this district. The plaintiffs in that case have sought to certify the following class: "All persons and businesses supplied with, using, or exposed to water contaminated with Crude MCHM and provided by West Virginia-American Water Company in Logan, Clay, Lincoln, Roane, Jackson, Boone, Putnam, and Kanawha Counties and the Culloden area of Cabell County, West Virginia as of January 9, 2014." First Amended Consolidated Class Action Complaint at 29, *Good v. Am. Water Works Co.*, No. 2:14-cv-1374 (S.D.W. Va. Dec. 9, 2014). The plaintiffs seek damages for business or economic losses, lost wages, out-of-pocket expenses, medical costs, personal injuries, loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience resulting from the chemical spill. *Id.* at 69. The plaintiffs also seek medical monitoring for the class plaintiffs. *Id.* The plaintiffs have named Defendants Farrell and Southern in the class action suit, alleging that they bear responsibility for the chemical spill because of their role in directing operations at Freedom's facility and because they profited from the sale of their interests in that facility. *Id.* at 10.

The disposition of this criminal case could undoubtedly have collateral consequences for the class action suit. If a jury in this case finds that the Defendants negligently or unlawfully operated Freedom's chemical storage tank in Charleston, they might be collaterally estopped from contesting these issues in the class action suit. If they admit the same as part of a plea agreement, their admissions might be admissible in the civil trial. In addition, the seizure of Southern's assets in this case might ensure that they will be available to satisfy any civil damages ordered pursuant to the class action.

However, it does not necessarily follow that the participation in this case of a prosecutor that is a putative member of the class action suit would be improper.   A pecuniary interest that is too remote, insubstantial, or speculative generally does not require the disqualification of a judge.   *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826 (1986); *In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d 794, 798 (10th Cir. 1980); *In re Virginia Elec. & Power Co.*, 539 F.2d 357, 368 (4th Cir. 1976).

In *Aetna*, the Supreme Court held that any pecuniary interest judges may have had as putative members in a pending class action was highly speculative and contingent, given that the trial court had not yet certified a class, let alone awarded any class relief of a pecuniary nature. 475 U.S. at 826.   The Court concluded that "at some point, '[t]he biasing influence . . . [will be] too remote and insubstantial'" to require disqualification as a matter of due process.   *Id.* (citing *Jerrico*, 446 at 243).

In *In re New Mexico Natural Gas Antitrust Litig.*, the Tenth Circuit found that judicial recusal was not necessary under 28 U.S.C. § 455(b)(4)[7] where the judge's utility bills stood to be lowered by the class action litigation before him.   620 F.2d at 795–97.   The Court found the judge's interest "too insubstantial to require recusal," as the judge's gas bill might be lowered by a maximum of $31 per year and as "the policy to promote public confidence in the impartiality of the judicial system is not served to as great an extent by disqualifying a judge" where the judge would benefit, if at all, "as a member of the general public."   *Id.* at 796.   The Court reasoned that "a personal benefit or detriment shared in common with the community at large is perceived to have a different psychological effect on a judge than would a benefit or detriment

---

[7] § 455(b)(4) requires disqualification if a judge "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."

not so shared." *Id.* at 796–97.   In *Ortega Melendres v. Arpaio*, No. CV-07-2513-PHX-MHM, 2009 WL 2132693, at *10 n.6 (D. Ariz. July 15, 2009), the Court found that judicial recusal was not necessary under § 455(b)(4) when, "[e]ven under the unlikely scenario that the Court becomes an unnamed [member of a pending class action lawsuit], its interest in the outcome of the case would likely be *de minimis* and too insubstantial to necessitate recusal."

*In re Virginia Elec. & Power Co.*, the Fourth Circuit found that judicial recusal was not warranted by Canon 3C of the Code of Conduct for United States Judges[8] when the judge, as a customer of the plaintiff utility company, stood to receive a refund of $70 to $100 on his utility bill if the plaintiff were successful in the lawsuit before the judge.   539 F.2d at 360–61, 366–68. Although finding that $70 to $100 cash in hand would not be *de minimis* (in 1976), the Court found the judge's interest to be "remote and speculative" since it depended not only on the plaintiff winning the lawsuit and recovering the full amount claimed, but also on the plaintiff collecting the judgment and being required by the Virginia State Corporation Commission to pass on part of its recovery to consumers, matters which would not be determined by the litigation before the judge.   *Id.* at 368.

The Court finds the above cases instructive:   the substantiality of a potential benefit, the certainty of receiving the benefit, and the extent to which receipt of the benefit is likely to be influenced by a judge's decisions rather than by intervening acts, are material to whether that interest creates a conflict.   As "prosecutors may not necessarily be held to as stringent a standard of disinterest as judges," *Young*, 481 U.S. at 807, a prosecutor, like a judge, cannot be

---

[8] Canon 3C, like § 455(b)(4), also requires disqualification when a judge "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."   CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 3C(1)(c) (2014).

disqualified on the basis of a financial interest that is too remote, insubstantial, or speculative to create an actual or potential conflict of interest.[9]

Here, a class has not yet been certified in the pending class action lawsuit.   A hearing on the motion for class certification is not set to be heard until September 25, 2015.   *See* Order at 2, *Good v. Am. Water Works Co.*, No. 2:14-cv-1374 (S.D.W. Va. Oct. 27, 2014).   The responses to the Court-ordered questionnaires by the supervisory attorneys for this case have revealed that they suffered only trivial economic harms and some inconvenience.   The supervisory attorneys also affirmed that they do not expect to benefit from the class action lawsuit filed in connection with the water crisis.   Even assuming that these attorneys were to become members of this class action—itself a remote possibility at this time—their financial interest in the outcome of the case as putative class action members would likely be too insubstantial to necessitate disqualification, in light of the insignificant harms they have personally suffered as a result of the water crisis.[10] The Court finds the supervisory prosecutors' interest in the class action suit to be too remote, insubstantial, and speculative to present a significant risk that the prosecutor's judgment would be distorted by the prospect of private gain.[11]

---

[9]  The difference in treatment between judges and prosecutors "is relevant to whether a conflict is found, . . . not to its gravity once identified."   *Young*, 481 U.S. at 810–11.   The Court here does not discuss the gravity of an actual or potential conflict; rather, the Court asks whether the alleged interest is of sufficient gravity to create a conflict in the first place.

[10]  Although the prosecutors' ultimate financial interest could increase if a class were certified, the Defendants were found liable, *and* punitive damages were awarded, such an outcome would be out of the hands of the prosecutors in this case and are even more speculative at this time.

[11]  The Defendants also argued in their initial briefing that "[e]ven if any person associated with the United States Attorney's Office were not monetarily affected by the leak, they would certainly be interested in seeing that any subsequent medical monitoring that might be ordered in the future was adequately funded."   (ECF 7 at 4 n.2; *see also* ECF 25 at 5.)   However, limited discovery in this case did not suggest the need for medical monitoring by any of the prosecutors involved in this case or members of their households, and all three supervisory prosecutors have affirmed that if medical monitoring is awarded neither they nor any members of their household intend to participate in the medical monitoring.

Thus, the Court finds that the supervisory prosecutors' continued participation in this case despite the pendancy of the class action lawsuit in which they are putative members neither violates due process nor rises to the level of an actual conflict of interest.[12]

### 2. Bankruptcy Claims

Southern has also asserted that the supervisory attorneys are under a conflict of interest as putative claimants in Freedom's bankruptcy case.   (ECF 22 at 3.)

Assistant U.S. Attorney Philip H. Wright stated at the January 5, 2015, hearing that no one on the prosecution team has filed a bankruptcy claim and that none may now do so given that the date for filing such a claim has passed.   (*See also* ECF 26 at 11–12.)   At the motion hearing, Southern proferred the fact that a proof of claim had been filed in bankruptcy court on behalf of members of the pending class action lawsuit.   However, as the supervisory attorneys' pecuniary stake in the pending class action is *de minimis*, so too must be their financial interest in any future recovery flowing from the class action through bankruptcy proceedings.

### 3. Criminal Restitution

Finally, Southern has asserted that the supervisory attorneys are potential beneficiaries of any criminal restitution that is ordered in this case.

The Mandatory Victims Restitution Act (MVRA) provides for mandatory restitution to individuals "directly and proximately harmed" by specified offenses.   18 U.S.C. § 3663A(a)(2). Mandatory restitution is limited to those who have suffered "physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), and restitution is not required if "the number of identifiable victims is so large as to make restitution impracticable," 18 U.S.C. § 3663A(c)(3)(A).

---

[12] The Court's conclusions are only underscored by the information the Court has received that both of these Defendants have settlements pending in the class action case.

The supervisory attorneys have suffered no physical injuries.   They did incur minor out-of-pocket expenses.   If the harm suffered by the supervisory attorneys suffices for them to be considered identifiable "victims" for the purposes of the MVRA,[13] then it is likely that the number of identifiable victims is so large as to make restitution impracticable, and thus not required.[14]   It is also hard to imagine a financial interest in restitution of a sum of such small magnitude injecting economic self-interest into the exercise of prosecutorial discretion.   Finally, the prospect of its recovery via complex white collar criminal proceedings is remote and would be contingent on the prosecutors taking the unusual step of bringing evidence of their own out-of-pocket expenses to the Court's attention (something highly unlikely to have occurred here had it not been requested of them) and on the Court taking the unusual step of ordering that restitution be paid to a prosecutor.   The Court finds that any pecuniary interest by the supervisory attorneys in the outcome of the case based on the MVRA would be remote, insubstantial, highly contingent, and, probably, illusory.   It does not present a significant risk of distorting the exercise of prosecutorial discretion.

---

[13] The MVRA's definition of a "victim" is similar to the CVRA's definition of a "victim."   The CVRA definition is discussed *infra*, at note 17.

[14] The United States moved this Court for authorization to employ alternative means of victim notification under 18 U.S.C. § 3771(d)(2), arguing that the large number of potential victims in this case makes compliance with the victim notification requirements of 18 U.S.C. § 3771 impracticable.   (ECF 60 and 154.)   The Court granted the motion, finding that "the number of potential victims in this case make the statutory methods of notification impracticable."   (ECF 188.)

### B. Supervisory Attorneys' Alleged Status as "Victims"

The Defendants argue that, because the supervisory attorneys suffered inconveniences and hardships as a result of the water crisis, they are victims of the environmental crimes with which the Defendants are charged.   The Defendants argue, in turn, that this creates a conflict of interest that requires the disqualification of the entire U.S. Attorney's Office for the Southern District of West Virginia.

A conflict of interest exists when there is a "significant risk" that a representation will be "materially limited" by an attorney's "personal interest."   MODEL RULES R.1.7(a)(2).   *See also* W. VA. RULES R. 1.7(a)(2) (same).   Although the rules of legal ethics do not specifically address situations in which a prosecuting attorney is, or has a relationship with, a victim,[15] courts have suggested that a prosecuting attorney's unusually strong emotional interest in the outcome of a case, or personal animus toward a defendant, might call into question the prosecutor's exercise of impartial judgment.   In *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.), the Second Circuit remarked that a prosecutor is "not disinterested if he has, or is under the influence of others who have, an axe to grind against the Defendant, as distinguished from the appropriate interest that members of society have in bringing a Defendant to justice with respect to the crime with which he is charged."   In *United States v. Heldt*, 668 F.2d 1238, 1275 (D.C. Cir. 1981), the D.C. Circuit held that the fact that the defendant was charged with illegal entry into one of the offices of a U.S. Attorney's Office did not make the entire

---

[15] The rules of legal ethics do, however, recognize the potentially distorting influence on professional judgment posed by a lawyer's emotional involvement with a client.   *See* MODEL RULES R.1.8 cmt. 17 (a client-lawyer sexual relationship "presents a significant danger that, because of the lawyer's emotional involvement, the lawyer will be unable to represent the client without impairment of the exercise of independent professional judgment"); W. VA. RULES R. 1.8 cmt. 22 (same).   *Cf. also* ABA STANDARDS FOR CRIMINAL JUSTICE 3–3.2 (2014) ("The prosecutor generally serves the public and not any particular government agency, law enforcement officer or unit, witness or victim.").

16

Office a "victim" of the crime or provide grounds for disqualification.   The Court found that "to the extent that a 'victim' exists in such a crime, it is the United States of America," and that none of the government attorneys had been victims of the crime charged or shown any "special emotional stake" in the outcome of the case.   *Id.*[16]

The supervisory attorneys for the prosecution suffered specific, personal, and tangible harms that are linked causally with the conduct with which the Defendants are charged.   Farrell argues that these harms place the supervisory attorneys within the broadly-worded definition of a "victim" contained in the Crime Victims' Rights Act (CVRA).   (ECF 36 at 4.)   The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense."   18 U.S.C. § 3771(e).   The CVRA confers eight rights on statutory crime victims: (1) the right to be protected from the accused; (2) the right to timely and accurate notice of public court proceedings; (3) the right not to be excluded from public court proceedings; (4) the right to be heard at public court proceedings involving release, plea, sentencing, and parole; (5) the right to confer with prosecutors; (6) the right to full and timely

---

[16]   *See also United States v. Basciano*, 763 F. Supp. 2d 303, 312 (E.D.N.Y. 2011) (declining to disqualify entire U.S. Attorney's Office based on allegation that it had "an axe to grind" with defendant over his solicitation of the murder of an Assistant U.S. Attorney in that Office); *In re Grand Jury Proceedings*, 700 F. Supp. 626, 629 (D.P.R. 1988) (declining to disqualify entire U.S. Attorney's Office based on allegation that the U.S. Attorney had an emotional interest in his grand jury investigation because the U.S. Attorney's brother testified before the grand jury and because the defendant had filed a complaint against the brother); *People v. Vasquez*, 137 P.3d 199, 209 (Cal. 2006) ("[T]hat a public prosecutor might feel unusually strongly about a particular prosecution or, inversely, might hesitate to commit to a prosecution for personal or political reasons does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution."); *Schumer v. Holtzman*, 60 N.Y.2d 46, 56 (N.Y. 1983) (prosecutor's "anxiety" over an appearance of impropriety, arising from past political differences with defendant, not grounds for disqualification); *People v. Superior Court (Greer)*, 19 Cal. 3d 255, 269–70 (Cal. 1977) (holding that district court was within its discretion in disqualifying prosecutor in murder trial when murder victim was the son of a member of the district attorney's staff who worked in the office in which the prosecution was being prepared, and stating that the prosecutor might at least appear to have an emotional stake in the case of the sort which could disturb his exercise of impartial judgment); *Louisiana v. Cox*, 167 So.2d 352, 356–58 (La. 1964) (holding that, although prosecutor recused himself in case charging defendant with defaming prosecutor, failure of trial judge to order recusal of prosecutor in case charging defamation of a district judge based on same incident violated defendant's right to a fair trial).

17

restitution as provided in law; (7) the right to proceedings free from unreasonable delay; and (8) the right to be treated with fairness and respect. *See* 18 U.S.C. § 3771(a). It also confers standing on statutory crime victims to assert the rights afforded under the CVRA. *See* 18 U.S.C. § 3771(d)(1).

Southern essentially argues that, once the label of "victim" is attached to a prosecutor, the prosecutor has an impermissible interest in prosecuting the alleged crime of which he or she is a victim. (*See* ECF 163 at 2, 8, 9.) Even assuming arguendo that the harms suffered by the supervisory attorneys are neither too trivial nor too factually attenuated to establish "victim" status under the CVRA,[17] Southern's reliance on their statutory crime victim status is exceedingly formalistic. The rights afforded to victims by the CVRA create no pecuniary interest. The mere fact of being eligible for the rights provided by the CVRA, without more, is unlikely to inject impermissible considerations into a prosecutor's exercise of discretion. Nor would it reasonable to conclude that a prosecutorial decision would be motivated by a desire to become eligible for those rights.

Farrell argues that, once a conflict is found, the Court does not weigh the gravity of the conflict, citing *Young*, 481 U.S. at 810–11. However, the Court here does not discuss the gravity of an actual or potential conflict; rather, the Court asks whether the alleged interest is of sufficient

---

[17] Determining who has been "directly and proximately" harmed can be a vexing issue in environmental crime cases. *See* Andrew Atkins, Note, *A Complicated Environment: The Problem with Extending Victims' Rights to Victims of Environmental Crimes*, 67 WASH. & LEE L. REV. 1623, 1639–43 (2010) (discussing cases). The United States has denied, for the purpose of the present disqualification motions, that the prosecutorial team or the supervisory attorneys for this case are victims of the water crisis and has asserted that only the undifferentiated "public" is a victim. (ECF 26 at 8.) It has, indeed, been said that "[t]he Clean Water Act is public-welfare legislation and the victims of violations are the public," *United States v. Snook*, 366 F.3d 439, 445 (7th Cir. 2004) (citing *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1049 (9th Cir. 2002)), albeit not in interpretation of the CVRA. However, the principle that the public is the victim clearly does not control here, as the United States has moved this Court for authorization to employ alternative means of victim notification under 18 U.S.C. § 3771(d)(2), arguing that the large number of potential victims in this case makes compliance with the victim notification requirements of 18 U.S.C. § 3771 impracticable. (ECF 60 and 154.) The government's position on this point has been somewhat unclear.

gravity to create a conflict in the first place.  *See Aetna*, 475 U.S. at 826.   There may be many circumstances in which a prosecutor's status as a victim creates a conflict, but the Court finds that this exceptional case is not one of them.

The facts of this case are somewhat unique in that (1) the U.S. Attorney and other supervisory members of the prosecutorial team were among approximately 300,000 local community residents affected by the Defendants' alleged conduct, (2) the harms suffered by the U.S. Attorney and other supervisory members of the prosecutorial team appear likely to be no different than those suffered by the least affected of area residents, and (3) the harms suffered by them personally were not at all great in magnitude.[18]   *Cf. In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d at 796–97 ("[A] personal benefit or detriment shared in common with the community at large is perceived to have a different psychological effect on a judge than would a benefit or detriment not so shared."); *Berthelot v. Boh Bros. Const. Co.*, 431 F. Supp. 2d 639, 646, 650 (E.D. La. 2006) (where levee breach during Hurricane Katrina caused judge and his wife temporarily to relocate from their home, suffering no economic loss and only "ephemeral and remote" inconveniences, recusal was not warranted in litigation arising out of levee breach).  These facts do not suggest that the supervisory attorneys are likely to have a special emotional stake in the outcome of this case, or an "axe to grind" with the Defandants. Were a defendant to, say, target a prosecutor for murder, or actually murder a close relation of the prosecutor, the conclusion might be inescapable that a deep antipathy for the defendant would be

---

[18]   It is fair to assume that nearly all those residing in "Do Not Use" areas lost the use of clean tap water for a few days.   However, members of the pending class action suit also allege suffering eye irritation, rashes, vomiting, diarrhea, nausea, difficulty breathing, personal injury, and unknowing exposure to MCHM during pregnancy.   In contrast, the supervisory attorneys did not report suffering any medical symptoms or unknown exposure.   Members of the pending class action suit also allege that they incurred expenses traveling to and paying for hotels outside of the "Do Not Use" area, lost wages, and lost business revenues.   In contrast, the supervisory attorneys lost no wages or revenues, and incurred only small expenses associated with acquiring bottled water.

19

expected to prevent the exercise of fairminded judgment by that prosecutor.  By contrast, the harms suffered by the supervisory attorneys in this case—inconveniences and minor to nominal costs apparently no greater than those suffered by hundreds of thousands of others as the result of the wide-spread contamination of water—are unlikely to engender such strong feelings as would present a significant risk of distorting prosecutorial judgment and limiting a prosecutor's ability to represent the public interest.[19]

In short, the harms suffered by the supervising attorneys do not undermine the Court's confidence that the prosecution of Southern and Farrell can be conducted in a disinterested fashion, or suggest that the supervisory attorneys possesses anything more than "the appropriate interest that members of society have in bringing a Defendant to justice with respect to the crime with which he is charged."   *Wright,* 732 F.2d at 1056.

---

[19]  These facts also distinguish this case from *Cox,* 167 So.2d at 352, on which the Defendants have relied.   In *Cox,* the defendant was charged with defaming a judge and the prosecutor on the same date and in the same incident.   *Id.* at 356.   The prosecutor recused himself from the case in which he was the victim but not from the case alleging defamation of the judge.   *Id.* at 356–57.   The court found that it was the trial court's duty to order the prosecutor to recuse himself, "when it was disclosed to him that [the prosecutor] was, in effect, an injured party in both cases and had a personal interest in securing the conviction."   *Id*. at 358.   The Court noted:

> The district attorney was here confronted with an accused who had allegedly made statements which defamed his character; he was the injured party.   A sincere and conscientious public official like District Attorney Pitcher would naturally be outraged by the alleged defamatory statements, as would any person having his good reputation.   He would naturally feel that a conviction of the accused would be a public vindication of the wrong done him, and he would have a great personal interest in seeing that the accused was convicted.

167 So. 2d at 357.   Here, unlike in *Cox,* the supervisory attorneys suffered minor and generalized inconveniences unlikely to cause the prosecutors to put the vindication of their individual harms before the vindication of the public interest.

### C. U.S. Attorney's Spouse's Professional Activities

The Defendants have argued that the professional activities of U.S. Attorney Goodwin's spouse, Amy Goodwin, also require disqualification of the entire United States Attorney's Office for the Southern District of West Virginia.

During the water crisis, Mrs. Goodwin was employed as the communications director for the Governor's Office of West Virginia. Defendant has pointed to statements made to the press by Mrs. Goodwin on January 21, 2014, after a second chemical was identified as having been released during the chemical spill, which impugn the credibility of Freedom,[20] and further pointed out that Southern was later charged with making a false oath in connection with Freedom's bankruptcy case. At the final hearing on the disqualification motions, Southern's counsel asserted that Mrs. Goodwin's comments are attributable to U.S. Attorney Goodwin under West Virginia ethics rules. W. VA. RULES R. 3.6(a) prohibits extrajudicial statements "that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." *See also* MODEL RULES R. 3.6(a) (same). The issue of attribution has not been briefed, and neither the West Virginia Rules of Professional Conduct nor the comments thereto indicate that the extrajudicial statements of a lawyer's spouse are attributable to that lawyer. However, in any event, Mrs. Goodwin's comments do not have a substantial likelihood of materially prejudicing these proceedings, as they were isolated, were made eleven months before Southern was indicted, and identified not Southern but a corporation of which he was not the sole officer.

At present, Mrs. Goodwin is the Commissioner of the West Virginia Division of Tourism.

---

[20] "It is absolutely absurd that we did not have this information from day one from this company," Mrs. Goodwin is quoted as saying. "To say there is a distrust and concern of information that Freedom continues to provide is an understatement."

During her tenure there, the Division of Tourism decided to allocate an additional $1.5 million of its budget to advertising for the state of West Virginia because of the water crisis, following a survey indicating that the state's image had been maligned by the water crisis.   Southern suggests that, because that money could have been used in other ways and therefore probably somehow impacted the professional activities of Mrs. Goodwin and the other employees of the Division of Tourism, this somehow made Mrs. Goodwin a victim of the water crisis.   The Court is not persuaded.   It is not alleged that Mrs. Goodwin suffered any private pecuniary harm as a result of the budget allocation, and if the expenditure of public funds financially injured anyone it was the state of West Virginia.   Organizations invariably must adapt their budgets, priorities, and activities to the course of external events; employees may be expected to adapt without feeling that they have been personally wronged, and without malice or animus toward those who may have caused the events.   Moreover, any impact on Mrs. Goodwin's employer is entirely irrelevant.

In another twist on this argument, Farrell also urges the Court to find that Mrs. Goodwin's current job gives her a significant interest in pursuing this case in order to restore West Virginia's reputation, and that this, in turn, creates divided loyalties in Mr. Goodwin. This alleged interest is entirely speculative.   Moreover, recognizing a conflict every time a prosecutor is married to a policy-making official on the basis of a criminal case's perceived policy implications or public profile would stretch the notion of a personal interest too far, pushing it from the domain of a private interest to that of the public interest.

22

### D. Appearance of Impropriety

Farrell and Southern also argue that, even if the Court does not find an actual conflict of interest, an appearance of a conflict of interest or loss of impartiality exists and requires the disqualification of the entire United States Attorney's Office for the Southern District of West Virginia.   (ECF 7 at 1, 7; ECF 22 at 1, 8, 10; ECF 25 at 6–7.)

MODEL CODE OF PROF'L RESPONSIBILITY CANON 9 (1980) provides that "[a] lawyer should avoid even the appearance of professional impropriety."[21]   In addition, courts have an interest in ensuring that "legal proceedings appear fair to all who observe them."   *Wheat v. United States*, 486 U.S. 153, 160 (1988).   A court must consider how the facts would appear to a "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person," *U.S. v. Jordan*, 49 F.2d 152, 156 (5th Cir. 1995), yet courts should "resolve all doubts in favor of disqualification," *United States v. Clarkson*, 567 F.2d 270, 273 (4th Cir. 1977).

Southern argues that there is an appearance of a conflict of interest based on all of the

---

[21]  The Model Code's "appearance of impropriety" standard did not make it into the more current Model Rules of Professional Conduct.   This has left "the viability of the appearance of impropriety standard somewhat in doubt." *United States v. Dancy*, No. CRIM. 3:08CR189, 2008 WL 2901682, at *7 (E.D. Va. July 23, 2008).   Although West Virginia has adopted the Model Rules, courts in this district have continued to affirm the appearance of impropriety standard.   *See United States v. Dyess*, 231 F. Supp. 2d 493, 498 (S.D. W. Va. 2002) (Haden, J.) (disqualifying entire U.S. Attorney's office based, *in part*, on an appearance of impropriety); *Roberts & Schaefer Co. v. San-Con, Inc.*, 898 F. Supp. 356, 359 (S.D.W. Va. 1995) (Goodwin, J.) ("The Court is aware that the comments to W.Va.R.Prof.Conduct 1.10 and the Model Rules criticize the 'appearance of impropriety' standard . . . . The Court, however, does not believe that those criticisms are wholly valid."); Syl. pt. 2, *State ex rel. Bluestone Coal Corp. v. Mazzone*, 697 S.E.2d 740, 743 (W. Va. 2010) ("[A] lawyer may be disqualified from participating in a pending case if his continued representation would give rise to an apparent conflict of interest or appearance of impropriety based upon that lawyer's confidential relationship with an opposing party.").   However, it is not clear whether an appearance of impropriety alone, absent an actual conflict or facts indicating the potential for a conflict, would suffice to require disqualification.   *See, e.g.*, *United States v. Titus*, No. CRIM.2:08CR154, 2009 WL 1675081, at *2 n.5 (E.D. Va. June 15, 2009) ("To avoid any possible appearance of impropriety, despite the lack of a factual basis for an actual or a potential conflict, the court recommends, but does not require, that the Public Defender's Office not have Colgan assist Dalton on this case.").   The Court need not resolve this question, however, because the circumstances of this case do not create an appearance of impropriety.

facts set forth in the previous sections.    However, the Court disagrees, substantially for the same reasons as discussed previously.    The supervisory attorneys have a speculative, remote, and insubstantial financial stake, if any, in the outcome of this case.    They have suffered only *de minimis* personal harms as a result of the water crisis, making it unlikely that they have any special emotional stake in the outcome of the case.    In addition, the professional activities of the U.S. Attorney's wife cited by the Defendants has little relevance to these proceedings.    The Court is confident that a reasonable person knowing and understanding all the relevant facts would not find an appearance of impropriety or that these legal proceedings appear unfair.

Southern also argues that various actions undertaken by U.S. Attorney's Office in his case create an appearance that Southern has been singled out for harsh treatment.    (ECF 22 at 9–11; ECF 35 at 9.)    Southern complains (1) that he was charged with wire fraud based on an ECF filing made by his attorneys (ECF 22 at 9); (2) that he was arrested at his home in Florida on December 8, 2014, without notice to his attorneys and without any factual basis to believe he was a flight risk (*id.* at 9–10); (3) that certain of his property was seized before he was found guilty of any crime (*id.* at 10); and (4) that a motion to reconsider Southern's bond noted that Southern lives in a "gated-community in a luxurious home." (*id.*).

The Court does not find that these actions create an appearance of impropriety.    The wire fraud count was contained in a criminal complaint reviewed by a neutral, detached federal magistrate judge, who issued a warrant for Southern's arrest upon a showing of probable cause.[22] (ECF 4.)    Notice to a defendant may not be appropriate if a defendant is a flight risk, and Southern's British citizenship, passport, and private pilot's license furnished an objective factual

---

[22]  The indictments returned by the grand jury also include a wire fraud count, but they are based on different allegations than those contained in the Criminal Complaint.

basis for determining that Southern was a flight risk.   Southern's property was seized pursuant to lawful authority, also after obtaining warrants from a neutral, detached federal magistrate judge, based upon a showing of probable cause.   (ECF 30-1.)   Finally, the explanation that Southern lives in a "gated-community in a luxurious home" does not smack of animosity in the context of a request to place a condition of home confinement on Southern's release.   The facts here would not suggest to a well-informed and objective observer that Southern has been singled out for harsh treatment.

Southern has also pointed to various statements to the media, press releases, and Twitter "tweets" by U.S. Attorney Goodwin, and their timing in relation to this case, which he argues have created an appearance of partiality or impropriety.   The Court finds no disqualifying impropriety in the proffered "tweets" and other statements.    It is not unusual for a U.S. Attorney to comment on the policy implications or community impact of an alleged crime.    In any event, the Court does not find that Mr. Goodwin's comments raise a disqualifying appearance of impropriety.

Having reviewed carefully the facts of this case and the Defendants' numerous submissions, the Court does not find that they create an appearance of impropriety.   The Court does not find that the peculiar circumstances of this case are likely to affect the public's confidence in the fairness and integrity of these judicial proceedings.

### E. Neither Disqualification of the Entire United States Attorney's Office, nor Further Discovery, is Warranted

"While a private attorney's conflict of interest may require disqualification of that attorney's law firm in certain cases, such an approach is not favored when it comes to the office of a United States Attorney."   *United States v. Hasarafally*, 529 F.3d 125, 128 (2d Cir. 2008). "[I]f the disqualification of one government attorney could serve as the predicate for the disqualification of the entire United States Attorney's Office, the administration of justice would be irreparably damaged."   *Grand Jury Subpoena of Ford v. United States*, 756 F.2d 249, 254 (2d Cir. 1985).   "An entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy."   *United States v. Basciano*, 763 F. Supp. 2d 303, 312 (E.D.N.Y. 2011).

Here, the Court has not found more than a *de minimis* personal or financial interest in the outcome of this case on the part of the three supervisory attorneys or the two other prosecutors assigned to this case.   In other words, no conflict of interest has been uncovered which may be imputed to the entire U.S. Attorney's Office.

The Defendants initially alleged that all or most members of the U.S. Attorney's Office for the Southern District of West Virginia have a conflict with this case.   Defendant Southern has objected that the questions submitted to the supervisory attorneys in this case should have been submitted to every person who works at the U.S. Attorney's Office.   (ECF 163-1 at 1.) Although the Defendants have made plausible allegations that other members of the U.S. Attorney's Office may have suffered harms as a result of the water crisis, further development of the record to determine how other members of the U.S. Attorney's Office might have been

personally affected is not warranted.   Even assuming arguendo that any harms suffered by other members of the U.S. Attorney's Office were not *de minimis*, the only conflicts alleged are personal conflicts.   Even in the private law firm context, the disqualification of a lawyer due to a personal interest conflict is ordinarily not imputed to other lawyers in the firm.   *See* MODEL RULES R. 1.10(a)(1); W. VA. RULES R. 1.10(a)(1).   Moreover, the trend among federal courts has been to limit vicarious disqualification to firms, absent attorney-specific findings that the entire U.S. Attorney's office was disqualified,[23]  whereas all of the prosecutors participating in this case are conflict-free.

Thus, the Court does not find a basis for imposing the drastic remedy of disqualifying the entire U.S. Attorney's Office for the Southern District of West Virginia.

---

[23] *See Hasarafally*, 756 F.2d at 254 (denying motion to recuse entire U.S. Attorney's office, where recusal of Attorney General Michael B. Mukasey, who had previously served as district judge before whom defendant appeared, avoided potential for conflict of interest); *Cope v. United States*, 272 F. App'x 445, 449 (6th Cir. 2008) (fact that Defendant was charged with attempting to murder an Assistant U.S. Attorney did not render constitutionally ineffective the failure of counsel to seek to disqualify the entire U.S. Attorney's office); *United States v. Bolden*, 353 F.3d 870, 879 (10th Cir. 2003) (reversing disqualification order where district court failed to detail either misconduct or alleged conflicts of interest on the part of the entire U.S. Attorney's office); *United States v. Vlahos*, 33 F.3d 758, 762–63 n.5 (7th Cir. 1994) (vacating order disqualifying entire U.S. Attorney's office, and finding that prosecutor was not conflicted, but that, even if she had been, a conflict-free prosecutor could have been appointed); *United States v. Caggiano*, 660 F.2d 184, 185, 190–91 (6th Cir. 1981) (reversing disqualification of an entire U.S. Attorney's office, where defendant's former lawyer was screened from participation); *United States v. Manna*, No. CIV 97-2034 DRD, 2006 WL 3063456, at *8 (D.N.J. Oct. 25, 2006) (denying disqualification of entire U.S. Attorney's Office where prosecutors who committed alleged misconduct in handling defendant's case no longer worked for the Office); *In re Grand Jury Proceedings*, 700 F. Supp. 626, 630–31 (D.P.R. 1988) (allegation that United States Attorney had a disqualifying emotional stake in grand jury investigation did not require disqualification of entire U.S. Attorney's office); *United States v. Hubbard*, 493 F. Supp. 206, 208 (D.D.C. 1979) ("[T]he fact that one member of the Office may have a disqualifying interest in the case does not preclude the entire Office from handling the case.").   *But see United States v. Dyess*, 231 F. Supp. 2d 493, 498 (S.D. W. Va. 2002) (disqualifying entire U.S. Attorney's office where prosecutors might have been called upon to testify regarding investigator misconduct).   *Cf. also United States v. Whitaker*, 268 F.3d 185, 194–96 (3d Cir. 2001) (reversing disqualification of U.S. Attorney's office, where district court erroneously determined that U.S. Attorney violated rules of professional responsibility).

27

*IV. CONCLUSION*

The motions to disqualify the U.S. Attorney's Office for the Southern District of West Virginia filed by Defendants Gary L. Southern [ECF 7 and 22] and Dennis P. Farrell [ECF 25] are therefore **DENIED**.[24]

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:      June 24, 2015

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

---

[24] In light of Southern's renewal of his initial motion for disqualification after the filing of the Indictment, the Government's motion to deny Southern's initial motion to disqualify on the basis that it was filed in the Criminal Complaint matter [ECF 11] is **DENIED AS MOOT**.   The pending motions for discovery [ECF 83 and 87] related to the disqualification motions are also **DENIED AS MOOT**.

28